437 S.E.2d 742

**BURGESS PIC–PAC, INC., D/B/A Burgess Discount Foods; Richard Burgess; and Linda Burgess, Plaintiffs Below, Appellants,**

v.

**FLEMING COMPANIES, INC.; Fleming Foods of Ohio, Inc.; Fleming Foods of Virginia, Inc.; and Fleming Foods of Tennessee, Inc., Defendants Below, Appellees.**

No. 21766.

Supreme Court of Appeals of West Virginia.

Submitted Sept. 21, 1993.

Decided Oct. 29, 1993.

Benjamin L. Bailey and Kenneth E. Webb, Jr., Bowles, Rice, McDavid, Graff & Love, Charleston, for plaintiffs.

Stephen R. Crislip, David A. Barnette, and Angela M. Fenton, Jackson & Kelly, Charleston, for defendants.

MILLER, Justice:

The appellants, plaintiffs below, Burgess Pic–Pac, Inc., d/b/a Burgess Discount Foods; Richard Burgess and Linda Burgess (collectively "Burgess"), appeal an order of the Circuit Court of Raleigh County entered February 5, 1993, granting partial summary judgement for the appellees, defendants below, Fleming Companies, Inc., Fleming Foods of Ohio, Inc., Fleming Foods of Virginia, Inc., and Fleming Foods of Tennessee, Inc. (collectively "Fleming"). The case below related to a claim for damages by Burgess as a result of an alleged breach by Fleming due to Fleming's failure to renew an option in the sublease. The trial court found that the option to renew was Burgess's to exercise, not Fleming's, and that Burgess had failed to effectively exercise that right. For the reasons that follow, we reverse.

## I.

In 1968 the original landlord, By–Pass Plaza, Inc., leased commercial property in Beckley to the Great Atlantic & Pacific Tea Company ("A & P"). That lease (the "master lease") provided for an original term of years to run through August 31, 1984, and then provided the tenant, A & P, with four options to renew the lease for five-year terms. In 1982, A & P granted, conveyed, transferred and assigned "all of [A & P's] leasehold estate and rights, title and interest under the lease [between A & P and By–Pass Plaza, Inc., the original landlord] to Malone & Hyde, Inc. ['M & H']." [1] M & H exercised the first renewal option and extended the lease for a five-year term beginning in September of 1984.

Thereafter, in 1985, M & H transferred the premises to Burgess by way of a document entitled "sublease." After entering into the sublease with Burgess, M & H sold its business to Fleming, including the Burgess sublease. Fleming notified Burgess of the sale of the sublease by letter dated June 27, 1986, and also included an estoppel certificate that Fleming requested Burgess execute and return. The estoppel certificate stated, in part: "There are no extension or renewal options, options or rights of refusal on additional portions of any building, or options to acquire the Premises in favor of Subtenant, except as provided in the Sublease." Burgess crossed out the above-quoted language and wrote in two separate places on the estoppel certificate that Burgess had the right to exercise the three remaining five-year renewal options. Burgess then returned the certificate to Fleming. Fleming did not acknowledge the changes Burgess made to the estoppel certificate.

It does appear, however, that Burgess and Fleming discussed the possibility of Fleming stepping aside as a tenant under the master lease and allowing Burgess to negotiate a new lease directly with the landlord. This potential arrangement was apparently agreeable to both Burgess and Fleming, but, despite negotiations between Burgess and the landlord, a new lease was not consummated. Burgess contends that Fleming represented to Burgess that it would exercise the renewal option under the master lease. In reliance upon those representations, Burgess claims that it settled debts owed to Fleming that Fleming had acquired from M & H.[2] Burgess also claims that it relied upon Fleming's representations and incurred new debt to its detriment when it refurbished the leased premises.

In March of 1989, over five months before the Burgess sublease was to terminate if it was not renewed, Fleming informed Burgess that Fleming was not going to exercise its renewal option with the landlord. Fleming further advised Burgess that it should therefore plan to vacate the premises by the end of the lease term (August 31, 1989). In turn, Burgess, by counsel, responded and informed Fleming that Burgess had the right to renew its sublease and that it intended to do so. At about this same time, Fleming commenced construction of a new grocery store near the leasehold. Burgess vacated the leasehold shortly prior to the expiration of the lease.

In its complaint, Burgess contended, among other things, that Fleming had breached the sublease. Subsequently, Fleming moved for summary judgment on this issue. In its memorandum opinion, the trial court rejected Burgess's allegations, and found that the option to renew the sublease was Burgess's to exercise, not Fleming's. The trial court so found because there was language in the sublease between Burgess and M & H that embodied the conditions of the master lease.[3] The trial court concluded

---

1. The parties agree that the interest conveyed in the 1982 document resulted in a true assignment whereby M & H assumed all the benefits as well as the burdens that were vested in A & P under the master lease. *See Bankers Pocahontas Coal Co. v. Monarch Smokeless Coal Co.*, 123 W.Va. 53, 14 S.E.2d 922 (1941).

2. When M & H subleased the premises to Burgess, it loaned Burgess $400,000. At that time,

Burgess bought its food from M & H, a wholesale food distributor.

3. The applicable language in the Burgess sublease is:

"Except as herein otherwise provided, all of the terms, agreements and conditions in the Lease, as amended, attached hereto and marked Exhibit "A", are hereby made a part of this Sublease, TENANT herein being consid-

that Fleming, which stood in M & H's shoes, was like the landlord in the master lease, and Burgess was like the tenant under the master lease. The trial court found that Burgess thereby possessed the option to renew and that Burgess terminated the sublease by leaving the premises. Therefore, the trial court granted summary judgement for Fleming on that issue.

## II.

■ The primary legal issue is who had the right to exercise the renewal option under the master lease. The answer to this question is determined by examining the relationship between Fleming and Burgess under the 1985 document that gave Burgess the right to occupy the premises. Our initial inquiry is whether the 1985 document was an assignment or a sublease.

■ It is generally recognized that where a tenant assigns a lease to a third party for the lease's remaining term,[4] and the assignee is bound by all the terms and conditions contained in the master lease, the assignee becomes directly liable to the landlord. Consequently, the assignee has the right to exercise any renewal options in the master lease. We expressed an assignee's obligations in *Bankers' Pocahontas Coal Co. v. Monarch Smokeless Coal Co.*, 123 W.Va. 53, 59–60, 14 S.E.2d 922, 926 (1941):

"[W]here one takes a lease by assignment and also expressly assumes the payment of rent or other obligations of the lessee, he becomes not only an assignee, but an assumptor, as well, and is absolutely bound to the lessor for the residue of the term upon the obligations assumed, whether he ever occupies the premises or not. Nor can such assumptor relieve himself of the obligations undertaken by the simple device of voluntarily transferring the leasehold to another, even though that other, in turn, assumes the obligation."

*See generally* 49 Am.Jur.2d *Landlord & Tenant* § 397 (1970 & Supp.1993); 51C C.J.S. *Landlord & Tenant* § 44 (1968 & Supp.1993).

■ We defined the assignment of a lease in *Bowlby–Harman Lumber Co. v. Commodore Services, Inc.*, 144 W.Va. 239, 246, 107 S.E.2d 602, 606 (1959), where we stated:

"In 51 C.J.S., Landlord and Tenant, § 37, subsection a, it is said: 'Regardless of the form of the transaction, an assignment of an estate for years occurs where, and only where, the lessee transfers his entire interest in the estate without retaining any reversionary interest[.]' "

We pointed out in Syllabus Point 2 of *Bowlby–Harman Lumber Co.*, *supra*, that where a reversionary interest is retained by a tenant who is granting the premises to a third party, the instrument is a sublease:

"Where a lessee by written agreement underlets the premises to a third party and retains certain reversionary interests in the premises, and the written agreement does not disclose a clear intent to the contrary, the written agreement will constitute a sublease, not an assignment."

■ The retention of a reversionary interest occurs when a tenant conveys less than the entire term of a master lease to a third party. When a reversionary interest is retained, the third party is then a sublessee rather than an assignee. This rule is explained in 2 R. Powell, *The Law of Real Property* ¶ 248[2] at 17–50 (1993):

"The approach which appears to be followed in the majority of jurisdictions focuses on the time remaining on the lease at the time of transfer. If the tenant transfers the entire remaining term, retaining no reversion, the transfer is an assignment. Conversely, if the tenant retains a reversionary right to possession at the end of the term, no matter how small, the

---

ered as if Landlord in said Lease, and SUBTENANT herein being considered as if TENANT in said Lease."
The master lease was attached to the sublease as Exhibit A.

4. This principle assumes that a tenant has the right to assign the lease. This issue is not contested here because the master lease gave the tenant the right to assign or sublet. However, we note that the master lease also provided that, even if the original tenant assigned or subleased the property, it would still be liable to the landlord.

transfer is a sublease." (Footnote omitted).[5]

*See also* 51C C.J.S. *Landlord & Tenant* § 37(1) (1968 & Supp.1993); 49 Am.Jur.2d *Landlord & Tenant* § 392 (1970 & Supp. 1993).[6]

In this case, when we review the 1985 document between M & H and Burgess, we find that M & H did retain a reversionary interest in the master lease. The term extended to Burgess by M & H was as follows: "TENANT leases to SUBTENANT and SUBTENANT leases from TENANT the above described premises for the remainder of the *Term* and the aforementioned five-year extension, commencing March 1, 1985."[7] (Emphasis added). This document acknowledged the provisions of the master lease and that M & H had exercised the first of four renewal options by stating: "WHEREAS, in accordance with the provisions of said Lease, TENANT by continued occupancy automatically exercised the first of four (4) renewal options provided under said Lease, extending the Term for the period commencing September 1, 1984, and ending August 31, 1989[.]"

Consequently, we find that the word "Term" as used in the sublease referred to the current term by which M & H was bound and that would expire on August 31, 1989. As explained in the "WHEREAS" clause quoted above, this "Term" was the first of the four five-year renewal options. The sublease then granted "and the aforementioned five-year extension." The word "and" makes it clear that the five-year extension was in addition to the existing term ending August 31, 1989. Moreover, this paragraph ended with the following statement concerning the payment of the rent: "[Such rent is] to be paid on the first day of each month during the Term of this Sublease *or any renewal thereof.*" (Emphasis added). Clearly, Burgess did not receive the full term available to M & H under its lease, which consisted of three additional five-year renewal options. Therefore, M & H retained a reversionary interest in the master lease. Burgess only received one five-year renewal option. Thus, under the foregoing law, Burgess occupied the position of a sublessee rather than that of an assignee.

### III.

◼ The question then becomes what right Burgess had, as a subtenant, to exercise its option of renewal. We spoke generally of the relationship between a sublessee and a landlord in *Hawley Corp. v. West Virginia Broadcasting Corp.*, 120 W.Va. 184, 187, 197 S.E. 628, 629 (1938): "A sublease creates no privity of contract between the landlord and the sublessee. The latter's estate is but parcel of the lessee's estate, and is subject to the conditions imposed thereon by the [master] lease."

◼ Because a sublessee has no privity of contract with the landlord, where an option to renew has been granted by the tenant to the sublessee, the sublessee, in order to

---

**5.** M. Friedman, *Friedman on Leases* § 7.403 at 283–84 (1983), states the historical basis for the rule:

> "The ancient technical system of feudal law based the landlord-tenant relation on the existence of a reversion in the landlord. A tenant who sublet for the rest of his term parted with all his interest in the premises, leaving no reversion in himself, and thereby created an assignment. Briefly, tenant's sublease for the balance of his term creates an assignment, not a sublease. This occurs regardless of the terms of the instrument and regardless of the intentions of the parties. This is the rule established in England and adopted by the majority of our states. Feudal concepts permitted no other result." (Footnote omitted).

**6.** Where the entire term of the lease has been conveyed, there still may be an issue of whether the retention of certain rights, such as a right of re-entry, is a sufficient reversionary interest to make the document a sublease. *See generally* 49 Am.Jur.2d *Landlord & Tenant* § 395 (1970 & Supp.1993).

**7.** The relevant text of the paragraph of the sublease is:

> "TENANT leases to SUBTENANT and SUBTENANT leases from TENANT the above described premises for the remainder of the Term and the aforementioned five-year extension, commencing March 1, 1985, for a minimum monthly rental of Two Thousand Eight Hundred Fifty–Four and 95/100 Dollars ($2,854.95) (which is rental from Lease, as amended, plus 5%), to be paid on the first day of each month during the Term of this Sublease or any renewal thereof."

exercise the option, must ask the tenant, who does have privity of contract with the landlord, to exercise the tenant's renewal option with the landlord. The failure of the tenant to exercise its renewal option with the landlord after such a request will render the tenant liable to the sublessee. This general rule is set out in Section 1195 of 50 Am. Jur.2d *Landlord & Tenant* at 84–85 (1970):

"A lessee may not deny his obligation to renew or extend a sublease in accordance with a covenant to renew or extend contained in the sublease, where the lessee obtains a renewal or extension of the head lease or a new lease from the lessor, irrespective of whether such renewal, extension, or new lease is taken at a higher rental or upon more onerous terms; and a lessee who sublets a portion of the premises with the privilege of renewal for a specified term in case he obtains from the original lessor an extension of his lease, is bound by his covenant when he secures a new lease instead of an extension[.]" (Footnotes omitted).

*See also* 51C C.J.S. *Landlord & Tenant* § 58(3) at 184 (1968 & Supp.1993); Annot., 39 A.L.R.4th 824, 842 (1985 & Supp.1993).

Although we have not had occasion to discuss this principle, it has been followed in other jurisdictions under different facts. For example, in *Occidental Savings & Loan Association v. Bell Federal Credit Union*, 218 Neb. 519, 357 N.W.2d 198 (1984), the court held the tenant liable to its sublessee where the tenant had granted two additional five-year renewal options to the sublessee, even though the tenant had no authority under the master lease to grant renewal options. The court stated in its Syllabus Points 4 and 5:

"4. Contracts. One who by contract imposes a duty upon himself must substantially comply with that undertaking.

"5. Leases: Contracts: Liability. A sublessor who undertakes to grant renewal options he cannot deliver becomes, by reason of that breach of contract, liable in damages."

A similar result was reached in *Brummitt Tire Co. v. Sinclair Refining Co.*, 18 Tenn. App. 270, 75 S.W.2d 1022 (1934), where the sublessee sought to exercise his option to renew under the sublease, but the tenant failed to exercise his renewal option under the master lease. Instead, the tenant entered into a new lease with its landlord. The court in *Brummitt Tire Co.*, 18 Tenn.App. at 282, 75 S.W.2d at 1029, found the tenant liable stating:

"[The tenant] seeks to enjoy the fruits of his original contract, without the burden of his contract, by abandoning one instrument and securing another of like tenor.

" 'The defendants were not relieved from their covenant to extend the plaintiffs' term for four years because they obtained a new lease, instead of a technical renewal of their old one.' Hausauer v. Dahlman, 18 App.Div. 475, 45 N.Y.S. 1088, 1091, affirmed in 163 N.Y. 567, 57 N.E. 1111."

*See also Bsales v. Texaco Inc.*, 516 F.Supp. 655 (D.N.J.1981); *Gilman v. Nemetz*, 203 Cal.App.2d 81, 21 Cal.Rptr. 317 (1962).

As earlier stated, Burgess was a sublessee because it had not been conveyed the entire term of the master lease. As sublessee, Burgess was granted, under the M & H sublease, one five-year renewal option at the expiration of the term ending August 31, 1989.[8]

■ From the record, we find that there were sufficient facts developed below to indicate that Burgess attempted to have Fleming exercise its renewal option with the landlord (By–Pass Plaza). On March 7, 1989, Fleming wrote Burgess advising as follows:

"This is your notification that we do not wish to exercise the renewal option on the lease at the By–Pass store and will permit the lease to expire August 31, 1989.

"This advanced notice will give you time to make appropriate plans to vacate the premises or negotiate direct with the landlord for a new lease."

Burgess immediately responded, through its attorney, by letter dated March 10, 1989.

---

**8.** The parties do not dispute that Fleming purchased the assets of M & H and, thus, accrued to its position as the tenant under the master lease.

He advised Fleming that "[i]t is the intention of Burgess to extend this Lease for another five year period, which he has the right to do under the Lease." Moreover, the letter contained this admonition: "I need not remind you that if your company fails to live up to the terms of this Lease, it may be required to respond in damages to Burgess for all losses which Burgess may sustain[.]"[9] Moreover, there was deposition testimony by Mr. Burgess regarding his efforts after Fleming's March 7, 1989 letter to extend the sublease with both Fleming and the landlord, By–Pass Plaza, Inc.

Fleming failed to recognize that it owed a duty to Burgess to exercise its renewal option with the landlord in order to meet its obligation under the sublease to give the five-year renewal option. While Fleming argues in its brief that the sublease did not give Burgess a renewal option, we have found that it does.[10]

Fleming relies on *Regional Pacesetters, Inc. v. Eckerd Drugs of Georgia, Inc.*, 183 Ga.App. 196, 358 S.E.2d 481 (1987). However, in that case the court found that the sublessee had not been granted a renewal option in its sublease. Thus, the sublessee had no right to demand that the tenant exercise the renewal option in the master lease. Nor was there a renewal option granted to the sublessee in the sublease in two other cases cited by Fleming, i.e., *Loudave Estates, Inc. v. Cross Roads Improvement Co.*, 28 Misc.2d 54, 214 N.Y.S.2d 72 (1961), *aff'd*, 20 A.D.2d 864, 251 N.Y.S.2d 408 (1964), and *First Trust Co. v. Downs*, 230 S.W.2d 770 (Mo.App.1950).

Finally, Fleming argues that even if Burgess had the option to renew, it failed to do so. However, as we have previously discussed, there was sufficient evidence to demonstrate that Burgess did attempt to have Fleming exercise its right of renewal under the master lease in order to effectuate Burgess's renewal option contained in its sublease. Our traditional rules on the sufficiency of the evidence precluding summary judgment are stated in Syllabus Points 2 and 3 of *Pasquale v. Ohio Power Co.*, 186 W.Va. 501, 413 S.E.2d 156 (1991):

"2. 'A motion for summary judgment should be granted only when it is clear that there is no genuine issue of fact to be tried and inquiry concerning the facts is not desirable to clarify the application of the law.' Syllabus Point 3, *Aetna Casualty and Surety Co. v. Federal Insurance Co. of New York*, 148 W.Va. 160, 133 S.E.2d 770 (1963).

"3. 'The question to be decided on a motion for summary judgment is whether there is a genuine issue of fact and not how that issue should be determined.' Syllabus Point 5, *Aetna Casualty and Surety Co. v. Federal Insurance Co. of New York*, 148 W.Va. 160, 133 S.E.2d 770 (1963)."

For the foregoing reasons, we conclude that the circuit court erred in granting partial summary judgment for Fleming. Moreover, our ruling may require reconsideration of the trial court's holding which appears to exclude the Burgess claim for violation of the restrictive covenant after August 31, 1989.[11]

---

9. The quoted sentence concluded with the phrase "during the period of fifteen years beginning September 1, 1989." As we have earlier pointed out, the sublease gave Burgess only a renewal right for one five-year option beginning September 1, 1989. This would be the extent of the damage period.

10. Fleming quotes the term of the sublease as follows:

"TENANT leases to SUBTENANT and SUBTENANT leases from TENANT the above described premises *for the remainder of the ... five-year extension,* commencing March 1, 1985 for a minimum monthly rental of Two Thousand Eight Hundred Fifty–Four and 95/100 Dollars ($2,854.95) (which is rental from Lease, as amended, plus 5%), to be paid on the first day of each month during the Term of this Sublease or any renewal thereof." (Alteration in original).

The ellipsis omits the critical language "Term and the aforementioned." The full text of this paragraph is set out in note 7, *supra.* In the accompanying text, we discussed why Burgess received the right to only one five-year extension.

11. The trial court made the following finding:

"The covenant not to compete expired with the lease, and to the extent that the claim for violation of that covenant is based on the operation of [Fleming's grocery store] after August 31, 1989, a cause of action does not exist, and partial summary judgement should be granted Fleming for that portion of the claim. It is noted that Fleming claims that the operation of

This was the date the trial court determined that the Burgess sublease expired. We have found that Burgess was entitled to the additional five-year option.[12]

### IV.

Based upon the foregoing, the partial summary judgment order of the Circuit Court of Raleigh County is reversed as to the breach of the sublease allegations.

Reversed and remanded.

[Fleming's grocery store] began no earlier than October, 1989. If this is undisputed, there is no cause of action for a violation of the covenant not to compete and summary judgement should be granted on this issue."

12. In making this ruling, we are not passing on the validity of the restrictive covenant claim.