569 S.E.2d 796

STATE of West Virginia ex rel. Frazier &
Oxley, L.C., a West Virginia Legal Cor-
poration, and William M. Frazier, Indi-
vidually, Petitioners

v.

Honorable John L. CUMMINGS, Judge of
the Circuit Court of Cabell County, St.
James Management Company, L.L.C, a
West Virginia Limited Liability Compa-
ny, and City National Bank of West
Virginia, Respondents

No. 30434.

Supreme Court of Appeals of
West Virginia.

Submitted April 23, 2002.

Decided June 27, 2002.

Thomas E. Scarr, Esq., Stephen J. Golder, Esq., Michael E. Estep, Esq., Jenkins Fenstermaker, PLLC, Huntington, West Virginia, Attorneys for Petitioners.

Daniel T. Yon, Esq., Molly Baber, Esq., Bailes, Craig & Yon, Huntington, West Virginia, Attorneys for St. James Management.

Ancil G. Ramey, Esq., Michelle E. Piziak, Esq., Steptoe & Johnson, Charleston, West Virginia, Attorneys for City National Bank.

MAYNARD, Justice:

Petitioners, Frazier & Oxley, L.C. and William M. Frazier (Frazier & Oxley), seek extraordinary relief from a February 6, 2002 order entered by the Circuit Court of Cabell County which granted partial summary judgment to the respondents, St. James Management Company, LLC (St.James) and City National Bank of West Virginia. Frazier & Oxley argues that the prime lease between St. James and City National Bank was not terminated in accordance with its own terms; therefore, the sublease under which the law firm occupies space in the St. James Building remains in full force and effect. We agree and grant the relief requested.

## I.

## FACTS AND PROCEDURE

The St. James Building is a twelve story building which is located in Huntington, West Virginia and is used for both residential and commercial purposes. On May 7, 1980, the First Huntington Building Corporation, predecessor in interest to St. James,[1] entered into a lease arrangement in The First Huntington Building, now the St. James Building, with the Old National Bank of Huntington, predecessor in interest to City National Bank of West Virginia.[2] This lease is known as the master lease or the prime lease. Pursu-

---

1. Since 1980, ownership of the St. James Building has transferred several times, each time subject to the prime lease and amendments thereto. Ownership passed from the First Huntington Building Corporation to the St. James Limited Partnership to the West Virginia Investment Management Board and finally to the St. James Management Company on April 29, 1999.

2. Pursuant to an agreement and plan of reorganization and merger executed in 1996, the Old National Bank became part of City Holding Company. City National Bank subsequently became the lessee under the terms of the prime lease and the lessor under the terms of the sublease.

ant to the lease, The Old National Bank leased the lobby, mezzanine, vault and safe deposit area, drive-thru, and parking spaces in the St. James Building. The term of the lease was for twenty successive one-year terms and expired at midnight on October 31, 1999. Under its terms, the lease would automatically renew for twenty successive one-year terms at the option of the lessee.

The terms of the prime lease provided that the lessee could terminate the lease by giving the lessor written notice of its intention to vacate the premises sixty days prior to the expiration of the original term or any renewal thereof. The lessee could also terminate the lease by providing ninety days notice and paying one year's rent as a penalty. The lessor reserved no right to terminate.

In 1986, Frazier & Oxley proposed that the Old National Bank sublease its mezzanine space to the law firm. By lease and agreement dated June 15, 1987, Frazier & Oxley subleased the mezzanine for a one-year term beginning December 1, 1987; the sublease provided for automatic renewal for thirty-one successive one-year terms [3] unless the sublessee gave the sublessor written notice of its intent to vacate the premises sixty days prior to the expiration of the original term or any renewal thereof. As with the prime lease, the sublessor reserved no right to terminate the lease.[4] Frazier & Oxley subsequently subleased the storage room in the basement, the stairway near the mezzanine level restrooms and continuous accessibility to the stairway, and four parking spaces.

At the time the mezzanine was subleased, it consisted of raw unfurnished space. Due to banking regulations, the bank was not in a position to expend money to perform the extensive renovations required to transform the mezzanine into usable space. Consequently, under the terms of the sublease, Frazier & Oxley agreed to pay the bank rent at a rate of $250 per month and to be responsible for renovating the space.

On June 16, 1987, Frazier & Oxley assigned all of its rights and obligations under the sublease to William M. Frazier. As part of the assignment, Mr. Frazier agreed to personally finance the renovation of the mezzanine. Under the sublease, the improvements would become part of the real estate. Through a lease and agreement executed on June 17, 1987, Mr. Frazier subleased all of his rights and interest in the leasehold estate to Frazier & Oxley at a cost of $4,000 per month for the first six years and thereafter for $2,000 per month.

Following City Holding Company's acquisition of the Old National Bank which then operated as City National Bank, a dispute arose between City National Bank and Frazier & Oxley regarding the sublease and other matters. The parties reached a compromise which resulted in a settlement agreement and release that was signed on November 9, 1999. The significant part of the agreement is found in "Section Three—Terms of Settlement and Release," which reads as follows:

> e. The term of the sublease between THE OLD NATIONAL BANK OF HUNTINGTON and FRAZIER & OXLEY, LC., and/or any assignment thereof, shall be concurrent with the term of the master/primary lease between THE OLD NATIONAL BANK OF HUNTINGTON and the FIRST HUNTINGTON BUILDING CORPORATION, or any extensions or renewals thereof, and shall expire, with no further obligation upon any party thereto, upon the expiration or termination of the master/primary lease, or any extensions, renewals, or substitute leases of essentially identical premises by CHCO or its assigns and/or CNB or its assigns. Although reserving their right to do so, neither CHCO nor CNB has any present intention of terminating the master/primary lease between THE OLD NATIONAL BANK OF HUNTINGTON and the FIRST HUNTINGTON BUILDING

---

3. The lease and sublease are coterminous.

4. Perhaps this failure is explained by the fact that Mr. Frazier was president of both the bank's board of directors and of the building corporation's board. Mr. Oxley served as the bank board's secretary and signed the 1980 lease on behalf of the Old National Bank. Mr. Frazier signed the lease on behalf of the building corporation. Moreover, Frazier & Oxley prepared both the prime lease and the sublease.

CORPORATION, or any extensions or renewals thereof.

In the fall of 2000, City National Bank approached St. James seeking to terminate the prime lease. Meanwhile, the bank wished to maintain a drive-thru facility at the St. James Building location. After negotiation, on September 27, 2000, St. James and City National Bank entered into a lease termination agreement. The agreement provides that the "November 1, 1979 [lease] is hereby terminated effective October 31, 2000, at which time possession of the main banking facility located within the St. James Building will be surrendered to St. James." The parties simultaneously entered into a lease agreement for the Fifth Avenue drive-thru facility commencing on November 1, 2000 and ending on October 31, 2001, with a renewal option for one-year periods. This lease was not renewed.

On May 23, 2001, Fifth Third Bank leased the lobby, vault area, and safety deposit area in the St. James Building from the St. James Management Company. Fifth Third Bank later leased the Fifth Avenue drive-thru facility and signed an option to lease the mezzanine. The bank has exercised its option to lease the mezzanine. In July 2001, Frazier & Oxley was informed that its sublease terminated as a result of the termination of the prime lease. Despite the termination of the prime lease and the agreement reached between Frazier & Oxley and City National Bank, Frazier & Oxley remained on the premises. St. James provided official notice to vacate by letter dated October 26, 2001. As a result of the law firm's refusal to vacate, St. James filed a complaint in circuit court seeking immediate possession of the property and for damages. Frazier & Oxley subsequently filed a third-party complaint against City National Bank alleging breach of contract, equitable estoppel, third-party beneficiary, breach of covenant of good faith and fair dealing, and unjust enrichment.

The circuit court held a scheduling conference on January 9, 2002, during which St. James requested an expedited trial date due to its claim for immediate possession and its exposure to a potential claim by Fifth Third

Bank. The parties served on each other and responded to requests for admission, interrogatories, and requests for production of documents. On January 22, 2002, St. James filed a motion for partial summary judgment. City National Bank filed a motion to dismiss the third-party complaint alleging that the claims asserted were barred by the settlement agreement and release and that the complaint failed to state a claim upon which relief could be granted because the relationship between the parties was controlled by unambiguous written contracts.

The circuit court held a hearing on both motions on February 1, 2002. By order entered February 6, 2002, the court found that Frazier & Oxley was not entitled to notice of termination of the prime lease; that neither Frazier & Oxley nor William M. Frazier could be legally classified as a third-party beneficiary to the prime lease "and neither has a valid claim to possession of the property nor the right to assert that the Lease was not properly terminated[;]" that Frazier & Oxley remained on the property as holdover tenants on a month-to-month basis; and that Frazier & Oxley's claim of equitable estoppel was fatally flawed. The circuit court granted partial summary judgment to St. James and City National Bank by ordering Frazier & Oxley "to vacate and quit the premises and immediately surrender possession to the Plaintiff." [5] On February 14, 2002, Frazier & Oxley filed a petition for writ of prohibition in this Court seeking to vacate and/or stay the circuit court's summary judgment order. We granted a rule to show cause which stayed the proceedings that are pending in circuit court.

## II.

### STANDARD OF REVIEW

"'"A motion for summary judgment should be granted only when it is clear that there is no genuine issue of fact to be tried and inquiry concerning the facts is not desirable to clarify the application of the law." Syllabus Point 3, *Aetna Casualty & Surety Co. v. Federal Insurance Co. of New*

5. City National Bank's motion to dismiss is currently pending in circuit court.

*York,* 148 W.Va. 160, 133 S.E.2d 770 (1963).' Syllabus Point 1, *Andrick v. Town of Buckhannon,* 187 W.Va. 706, 421 S.E.2d 247 (1992)." Syllabus Point 2, *Painter v. Peavy,* 192 W.Va. 189, 451 S.E.2d 755 (1994). Moreover,

[i]n determining whether to entertain and issue the writ of prohibition for cases not involving an absence of jurisdiction but only where it is claimed that the lower tribunal exceeded its legitimate powers, this Court will examine five factors: (1) whether the party seeking the writ has no other adequate means, such as direct appeal, to obtain the desired relief; (2) whether the petitioner will be damaged or prejudiced in a way that is not correctable on appeal; (3) whether the lower tribunal's order is clearly erroneous as a matter of law; (4) whether the lower tribunal's order is an oft repeated error or manifests persistent disregard for either procedural or substantive law; and (5) whether the lower tribunal's order raises new and important problems or issues of law of first impression. These factors are general guidelines that serve as a useful starting point for determining whether a discretionary writ of prohibition should issue. Although all five factors need not be satisfied, it is clear that the third factor, the existence of clear error as a matter of law, should be given substantial weight.

Syllabus Point 4, *State ex rel. Hoover v. Berger,* 199 W.Va. 12, 483 S.E.2d 12 (1996).

## III.

### DISCUSSION

Frazier & Oxley argues that under the express terms of the prime lease, City National Bank could have properly exercised its rights of termination or non-renewal by pro-viding sixty days notice, or, alternatively, by providing ninety days notice and paying a penalty. Instead, the bank and St. James circumvented the express provisions of the lease by entering into a voluntary agreement for termination. In so doing, City National Bank surrendered its leasehold. The lease neither terminated nor expired. A surrender cannot affect the rights of a sublessee; [6] therefore, says Frazier & Oxley, summary judgment should be reversed and discovery should continue.

■ St. James argues that Frazier & Oxley is attempting to use the writ of prohibition as a substitute for a direct appeal, and any harm which the law firm may suffer as a result of vacating the premises can be remedied by money damages should Frazier & Oxley succeed on appeal.[7] St. James believes discovery is complete because the circuit court needed only five documents in order to make a ruling in this case: (1) the prime lease, (2) the sublease, (3) the lease termination agreement between St. James and City National Bank, (4) the settlement agreement between City National Bank and Frazier & Oxley, and (5) the letter from St. James to Frazier & Oxley ordering the law firm to vacate the premises. All of these documents were submitted to the court prior to the hearing on the motion for partial summary judgment.

City National Bank argues that the terms of the settlement agreement are clear and unambiguous. No notice provision is contained in the agreement; therefore, the bank was not required to give Frazier & Oxley notice of the cancellation of the prime lease. The sublease expired upon cancellation of the prime lease on October 31, 2000, and any claims which Frazier & Oxley might have against the bank that arise from the sublease are barred by the agreement.

6. Frazier & Oxley cites *Hawley Corp. v. West Virginia Broadcasting Corp.,* 120 W.Va. 184, 197 S.E. 628 (1938), and *Ocean Grille, Inc. v. Pell,* 226 A.D.2d 603, 641 N.Y.S.2d 373 (1996), for this proposition. As neither of these cases contains the complicating factor of a settlement agreement, their holdings are not conclusive in the present case.

7. We reject this argument because the desired relief cannot be obtained on direct appeal. The circuit court ordered Frazier & Oxley to vacate the premises immediately; meanwhile, the court has not ascertained whether "surrender" of the lease was contemplated at the time the settlement agreement was signed. Once this issue is resolved, Frazier & Oxley may not be required to vacate their leased space in the St. James Building. As we will discuss later in this opinion, the court erred by entering this order.

Both St. James and City National Bank conclude without discussion that because the document under which the prime lease was canceled is called a "LEASE TERMINATION AGREEMENT," the prime lease thereby expired or was terminated. Frazier & Oxley counters that because the termination was voluntary and the express provisions of the prime lease were not followed, the lease was surrendered. As Frazier & Oxley anticipated that the prime lease would cease to operate according to its own terms, that is, only by expiration or termination, the law firm contends that its rights under the sublease were unaffected.

■ We begin our discussion with the basic premise that a subtenant's rights differ when a prime lease is surrendered instead of ending on its own terms. It is well established that "[t]he surrender of a lease by a lessee to his or her lessor, after a sublease, will not be permitted to operate so as to defeat the estate of the sublessee." 49 Am. Jur.2d *Landlord and Tenant* § 1186 (1995). However, "the termination of the primary lease terminates the sublease." *Cato v. Silling*, 137 W.Va. 694, 714, 73 S.E.2d 731, 743 (1952). (Citations omitted). The question in this case becomes whether the lease was surrendered or terminated.

■ Surrender is defined as

the restoring and yielding up of an estate for life or for years to one who has the immediate estate in reversion or remainder whereby the lesser estate is merged in the reversion or remainder. Thus, a surrender of a tenancy for years or a lesser tenancy is a yielding up of the tenancy to the owner of the reversion or remainder so that the tenancy is submerged and extinguished by agreement or by operation of law. *It is the giving up of a lease before its expiration.*

A surrender is governed by the intent of the parties; it may be accomplished either by agreement of the parties or by operation of law, whereby the surrender results from acts which imply mutual consent, independent of the expressed intention of the parties that their acts shall have that effect.

49 Am.Jur.2d *Landlord and Tenant* § 242 (1995). (Emphasis added). *See also Parsons & Sweeney Oil Co. v. McCormick*, 68 W.Va. 604, 608, 70 S.E. 371, 372 (1911) ("Surrender is a yielding up of the possession of an estate for life or years to him who has the immediate reversion or remainder, wherein the particular estate may merge or drown by mutual agreement. Minor's Real Prop. § 1212.").

■ Long ago, the Supreme Court of Pennsylvania held that "[i]t is a reasonable rule of the law, and well settled, we think, that a tenant for a certain term, or for life, who has under-let, has no right to surrender his lease, to the prejudice of the subtenant." *Hessel v. Johnson*, 129 Pa. 173, 177, 18 A. 754, 754 (1889). (Citations omitted). A few years later, the Supreme Court of Arkansas held that "[w]here there is no covenant against subletting, a lessee has a right to sublease all or any part of the leased premises, and when he does so he cannot by a surrender of the leased premises to the lessor defeat the rights of his undertenant." *Mitchell v. Young*, 80 Ark. 441, 443, 97 S.W. 454, 454 (1906). The Supreme Court of Arizona also observed that "[i]t seems to be universally held by the courts that the rights of subtenant will not be destroyed or impaired by a surrender of the main lease. It would be unconscionable where the express terms of a sublease have not been violated to allow the landlord and lessee to terminate the original lease by their mutual consent over the protest of the subtenant." *Byrd v. Peterson*, 66 Ariz. 253, 257–58, 186 P.2d 955, 958 (1947).

■ This would be the end of our inquiry were it not for the settlement agreement which was executed between City National Bank and Frazier & Oxley. Absent that agreement, we would simply reverse the circuit court's award of summary judgment in favor of City National Bank and St. James and remand for a factual determination of whether a surrender of the prime lease occurred.[8] However, "if the surrender [of a

8. In *Wood v. Sterling Drilling & Production*, 188    W.Va. 32, 422 S.E.2d 509 (1992), the parties to a

prime lease] is with the consent of the subtenant, it will terminate his or her estate[.]" 49 Am.Jur.2d *Landlord and Tenant* § 1186 (1995).

By the settlement agreement's terms, Frazier & Oxley agreed that the term of the sublease would be concurrent with the term of the primary lease and that the sublease would expire "upon the expiration or termination of the master/primary lease[.]" Frazier & Oxley contends that the law firm did not anticipate "surrender" of the lease at the time the parties reached this agreement regarding "expiration" or "termination." Frazier & Oxley contends it did not intend to agree to terminate the sublease upon *surrender* of the prime lease.

We believe the terms of the settlement agreement as they are written are ambiguous and contradictory under two separate prongs of analysis. First, the agreement's specification that the sublease would expire upon termination or expiration of the prime lease is contrary to the contents of paragraph one which states that the sublease "will remain in force and effect" and subsection e. of the same paragraph which states that "neither CHCO nor CNB has any present intention of terminating the master/primary lease[.]" Merely eleven months after the agreement was signed, City National Bank and St. James, by a separate agreement between them, canceled the prime lease. Not only was the prime lease canceled, but simultaneously therewith, St. James and City National Bank negotiated a new lease whereby the bank would lease the drive-thru facility from St. James. This lease was effective for exactly one year and was not renewed. In *Burgess Pic–Pac v. Fleming Companies,* 190 W.Va. 169, 174, 437 S.E.2d 742, 747 (1993), this Court cautioned by quoting favorably from *Brummitt Tire Co. v. Sinclair Refining Co.,* 18 Tenn.App. 270, 282, 75 S.W.2d 1022, 1029 (1934), as follows:

"[The tenant] seeks to enjoy the fruits of his original contract, without the burden of his contract, by abandoning one instrument and securing another of like tenor."

" 'The defendants were not relieved from their covenant to extend the plaintiffs' term for four years because they obtained a new lease, instead of a technical renewal of their old one.' *Hausauer v. Dahlman,* 18 App.Div. 475, 45 N.Y.S. 1088, 1091, affirmed in 163 N.Y. 567, 57 N.E. 1111." St. James and City National Bank may have attempted to circumvent their obligations to the sublessee by canceling the original prime lease and entering into a new lease. If so, this behavior is untenable.

The contrary argument is to the effect that, taken together, these two provisions are not really contradictory at all; rather, the provisions indicate that, even though City Holding Company acquired the Old National Bank of Huntington, the original sublessor, the sublease "will remain in force and effect" until termination or expiration of the prime lease. Further, the contrary argument goes, the agreement is not contradictory because *both* parties, though neither had immediate intention of so doing, contemplated the termination of the prime lease in some fashion.

Aside from the foregoing ambiguity considerations, the second basis upon which we conclude that the settlement agreement is clearly and undisputedly ambiguous is that although the agreement says that the sublease "shall be concurrent with the term of the master/primary lease[,]" it is silent and does not address what happens in the event of the *surrender* of the lease. Instead, it only says that the sublease shall expire "upon the *expiration* or *termination* of the master/primary lease," i.e., expiration according to the terms of the lease or termination pursuant to its provisions. (Emphasis added).

"Contract language usually is considered ambiguous where an agreement's terms are inconsistent on their face or where the phraseology can support reasonable dif-

---

lease consented to surrender. This Court said that "the surrendered contract thereafter bound no one." *Id.,* 188 W.Va. at 34, 422 S.E.2d at 511. Moreover, the lease was extinguished and could not be resuscitated for the gain of the parties. In the case *sub judice,* St. James and

City National Bank canceled the prime lease pursuant to a termination agreement. The prime lease is surrendered and is, therefore, extinguished or void. The lessor and lessee cannot now revive or resuscitate the prime lease and terminate it according to its terms.

ferences of opinion as to the meaning of words employed and obligations undertaken." *Fraternal Order of Police v. Fairmont,* 196 W.Va. 97, 101, 468 S.E.2d 712, 716 (1996). A difference of opinion obviously exists in this case. City National Bank may have contemplated "surrender" of the prime lease at the time the settlement agreement was signed; however, Frazier & Oxley certainly did not. Consequently, Frazier & Oxley did not consent to the surrender of the prime lease. City National Bank subleased part of the leased premises in the St. James Building to Frazier & Oxley; City National Bank cannot now surrender the leased premises to St. James and thereby defeat the rights of the subtenant.

For the foregoing reasons, we find that the circuit court clearly erred by granting partial summary judgment to St. James and City National Bank. The writ of prohibition prayed for by Frazier & Oxley is granted.

Writ granted.