723 S.E.2d 277

**FREDERICK MANAGEMENT COMPANY, L.L.C., Plaintiff Below, Appellant**

v.

**CITY NATIONAL BANK OF WEST VIRGINIA, a National Banking Association, Defendant Below, Appellee.**

No. 35438.

Supreme Court of Appeals of West Virginia.

Submitted Sept. 7, 2010.

Decided Nov. 23, 2010.

**552**

Thomas L. Craig, Todd A. Biddle, Bailes, Craig & Yon, Huntington, WV, for Appellant.

Ancil G. Ramey, Hannah B. Curry, Peter J. Raupp, Steptoe & Johnson, Charleston, WV, for Appellee.

PER CURIAM:

This is an appeal from an order entered March 23, 2009, in the Circuit Court of Cabell County, West Virginia, granting summary judgment in favor of Appellee City National Bank of West Virginia ("City" or "lessee") and against Appellant Frederick Management Company, LLC ("FMC" or "lessor"). Lessor FMC argues that genuine issues of material fact exist as to whether City, its lessee, breached the parties' Lease Termination Agreement (also referred to as "LTA") by failing to deliver 4,000 square feet of office space that City leased from FMC and subleased to the law firm of Frazier & Oxley, L.C. It is FMC's contention that its breach of contract claim against City should have been considered by a jury.

Upon careful consideration of the petition for appeal, the briefs and arguments of counsel, all matters of record and the applicable legal authority, and for the reasons discussed below, we reverse the order of the circuit court and remand this case for further proceedings.

I. Factual and Procedural Background

Many of the underlying facts of the present appeal are familiar to this Court as we twice considered issues related thereto in the previous cases of *State ex rel. Frazier & Oxley, L.C. v. Cummings*, 212 W.Va. 275, 569 S.E.2d 796 (2002) ("*Frazier & Oxley I*") and *State ex rel. Frazier & Oxley, L.C. v. Cummings*, 214 W.Va. 802, 591 S.E.2d 728 (2003) ("*Frazier & Oxley II*"). Thus, in this opinion, we shall recount some of the relevant facts discussed in *Frazier & Oxley I* and *II*, while also including those facts which are germane to resolution of the issues raised in the case *sub judice*.

The St. James Building is a twelve-story building located in Huntington, West Virginia, which was purchased by FMC in April 1999. Almost twenty years earlier, in May 1980, the building's then owner, the First Huntington Building Corporation,[1] entered

---

1. The First Huntington Building Corporation was a predecessor in interest to the St. James Management Company, LLC, to which the appellant, FMC, is the successor. The underlying Complaint was filed when FMC was known as the St. James Management Company, LLC. Likewise, in the complaint underlying *Frazier & Oxley I* and *II*, FMC was known as the St. James Management Company, LLC. In September 2005, the name of the St. James Management Company was changed to Frederick Management Company, LLC following the sale of the St. James Building to another entity. During the course of the instant case, but after *Frazier & Oxley I* and *II* were decided, the trial court granted the motion to substitute the name of the complaining party from the St. James Management Company, LLC to Frederick Management Company, LLC ("FMC"). Thus, to avoid confusion, we shall refer to the plaintiff throughout simply as FMC.

into a lease arrangement[2] with the Old National Bank of Huntington, predecessor in interest to Appellee City. Under the terms of that lease ("the prime lease"), the bank leased the lobby, mezzanine, vault and safe deposit area, drive-thru, and parking spaces in the St. James Building. The term of the prime lease was for twenty successive one-year terms beginning November 1, 1979, and ending at midnight, October 31, 1999. The prime lease further provided that it could be automatically renewed for twenty successive one-year terms at the option of the lessee bank.

Under the terms of the prime lease, the lessee bank could terminate the lease by giving the lessor written notice of its intention to vacate the premises sixty days prior to the expiration of the original term or any renewal thereof. The lessee bank could also terminate the lease by providing ninety days notice and paying one year's rent as a penalty. The lessor reserved no right to terminate the prime lease.

On or about June 15, 1987, the lessee bank entered into a written sublease with the law firm of Frazier & Oxley, L.C. (also referred to as "the law firm") for the mezzanine level of the leased office space.[3] Under the terms of the sublease, Frazier & Oxley paid to the bank $250.00 per month for 4,000 square feet of office space.[4] The sublease further provided for a term for one year beginning on December 1, 1987, and could be renewed automatically for thirty-one successive one-year terms unless written notice was given to the sublessor (the bank) of the intent of the sublessee (Frazier & Oxley) to vacate the premises sixty days prior to the expiration of any renewal term. The sublessor reserved no right to terminate the sublease.

One day after the sublease was entered into, on June 16, 1987, the law firm assigned all if its rights and obligations thereunder to William Frazier, one of its partners. On June 17, 1987 (the following day), Mr. Frazier subleased back to the law firm the right to occupy the mezzanine level for $4,000.00 per month for the first six years and thereafter for $2,000 per month. *Frazier & Oxley I,* 212 W.Va. at 278, 569 S.E.2d at 799.

In 1996, lessee and sublessor Old National Bank became a part of City and Old National Bank's location in the St. James Building became a branch office of City. As a result, Appellee City became the lessee under the prime lease and the sublessor under the sublease. In April 1999, ownership of the St. James Building was transferred to the appellant herein, FMC, with such transfer occurring subject to the prime lease and sublease discussed above. It is FMC's contention that it was unaware of the sublease between City and Frazier & Oxley when it acquired ownership of the building and for sometime thereafter. *See* discussion, *infra.*

Subsequently, City and Frazier & Oxley became involved in a dispute related, in part, to the sublease. On or about November 9, 1999, a settlement agreement was entered into between the parties, which provided, in relevant part, that the term of the sublease shall be concurrent with the term of the prime lease, " 'or any extensions or renewals thereof, and shall expire ... upon the expira-

---

**2.** At the time the lease arrangement was made, the St. James Building was known as The First Huntington Building.

**3.** As this Court recognized in *Frazier & Oxley I,* William Frazier and Lee Oxley, partners in the law firm of Frazier & Oxley, were board members of City's predecessor in interest, Old National Bank, the law firm's original sublessor. Messrs. Frazier and Oxley then became board members of City after it acquired Old National. Interestingly, Mr. Frazier, while president of the Old National Bank's Board of Directors, was also the president of the First Huntington Building Corporation, a predecessor in interest to FMC. He signed the prime lease on behalf of the lessor building corporation while Mr. Oxley, his partner

and the bank board's secretary, signed on behalf of the Old National Bank. Frazier & Oxley prepared both the prime lease and the sublease. *See Frazier & Oxley I,* 212 W.Va. at 278 n. 4, 569 S.E.2d at 799 n. 4.

**4.** The low rent amount was apparently in consideration for renovations and improvements required of the mezzanine level and which were to be undertaken by Mr. Frazier. City represents that Mr. Frazier personally spent $200,000.00 to renovate the mezzanine space. It is noted that although the prime lease provided for escalation of rent to be paid to the lessor by the lessee over the course of the lease's term, the sublease contained no such provision during the thirty-one year option period.

tion or termination of the master/primary lease'" [i.e., prime lease]. *Frazier & Oxley I*, 212 W.Va. at 278, 569 S.E.2d at 799. FMC contends that, having been unaware of the sublease, it was also unaware of the settlement agreement between City and Frazier & Oxley. *See* discussion, *infra*.

Sometime prior to April 2000, City determined that its banking operation located in the St. James Building had become unprofitable. On April 25, 2000, Matthew Call, Chief Operating Officer and Executive Vice President of City Holding Company (City's parent company), Larry Dawson, Senior Vice President of City Holding, and Robert Hardwick, Regional President of City's Huntington branch, all of whom had authority to act on behalf of City, attended a dinner meeting with John Hankins and Fred Davis, who were then co-owners of FMC. According to the deposition testimony of Messrs. Call and Hardwick, the purpose of the meeting was to inform FMC that City would not be renewing its lease in the St. James Building upon expiration of the then current renewal term on October 31, 2000. They further testified that at the end of the April 25, 2000, meeting, City made FMC fully aware of City's intention not to renew the lease at the end of the current renewal term. It is undisputed that although the terms of the prime lease provided that City, as lessee, could only terminate the lease by giving the lessor (FMC) written notice of its intention to vacate the premises sixty days prior to the expiration of, *inter alia*, any renewal thereof, no such written notice was ever tendered to FMC.[5]

Also during the April 25, 2000, dinner meeting between representatives of City and FMC, the possibility of City maintaining a drive-thru only banking facility at the St. James Building location was discussed and, over a period of time, agreed upon. Messrs. Call and Hardwick both testified that City's decision not to renew the prime lease was in no way conditional on the parties' agreement on a drive-thru only lease.

Following the April 25, 2000, meeting, City, as sublessor, did not notify its sublessee, Frazier & Oxley, that it would be ending the prime lease when the current renewal term expired on October 31, 2000. It is unclear from the record under what circumstances Frazier & Oxley learned the prime lease was going to end on October 31, 2000.

After City advised FMC it would not be renewing its lease, but before the Lease Termination Agreement was drafted, Mr. Hankins, FMC's co-owner, forwarded proposed floor plans to prospective tenants which showed the mezzanine space as being occupied by Frazier & Oxley and which referred to the law firm as a "tenant." On August 23, 2000, before the LTA was executed, Mr. Hankins wrote a letter to City's Robert Hardwick, which referred to City's intention to end the prime lease but also keep a drive-thru facility: "'If we decide to proceed, it will probably be necessary to cancel your existing lease and to enter into a new lease for the reduced space. We will also take the responsibility of negotiating a new lease for the law firm located on the mezzanine.'"

For his part, Mr. Hankins explained in deposition testimony that FMC considered the mezzanine to be part of the bank facility. He stated that he first learned that Frazier & Oxley occupied the mezzanine pursuant to a sublease with City during the discovery phase of its eviction case against the law firm. *See* discussion, *infra*. Prior thereto, Mr. Hankins believed Messrs. Frazier and Oxley occupied the mezzanine offices solely because of their status as board members of Old National Bank and, later, City,[6] and not pursuant to any sort of subtenancy relationship. Furthermore, Mr. Hankins explained that the floor plans prepared for prospective tenants showed the law firm on the mezzanine because he considered the firm to be a prospective tenant also, particularly because it was already occupying the space. When, in the August 23, 2000, letter to Mr. Hardwick, Mr. Hankins advised that he would take responsibility for negotiating a "new lease" for the law firm, he testified that he

---

**5.** As previously indicated, alternatively, the lessee bank could terminate the prime lease by providing ninety days notice and paying one year's rent as a penalty.

**6.** *See* n. 3, *supra*.

characterized the lease as "new" because there was no existing lease that he was aware of. According to Mr. Hankins, the sublease was not recorded. He testified that after he purchased the St. James Building, he asked City's Senior Vice President and Chief Legal Counsel, John W. Alderman, III and Steven Day, another City officer, under what arrangement Frazier & Oxley occupied the mezzanine office spaces. Mr. Hankins believed that they were either unaware of a sublease[7] or failed to advise Mr. Hankins that there was one.

A Lease Termination Agreement was ultimately drafted by Mr. Hankins (who is also a lawyer) and presented to representatives of City on September 27, 2000. The LTA provided, in relevant part, that a lease agreement had been entered into "for that certain banking facility located on the ground floor and mezzanine located in the St. James Building at Tenth Street and Fourth Avenue[.]" The LTA further provided that "for and in consideration of the premises which are not mere recitals, but are an integral part of this agreement .... [t]hat certain lease ... dated November 1, 1979 is hereby terminated effective October 31, 2000, at which time possession of the main banking facility located within the St. James Building will be surrendered to" FMC.

Simultaneously therewith, the parties executed a separate lease agreement for a drive-thru facility commencing on November 1, 2000, and ending on October 31, 2001, with a renewal option for additional one-year periods. Mr. Hankins also drafted the drive-thru lease agreement.

City's Robert Hardwick testified that it was his understanding that if City did not renew the prime lease, it would be giving up all of the space covered by the lease. (Hardwick 57) Furthermore, although he had not considered whether the LTA would have an impact on Frazier & Oxley's occupancy in the mezzanine office spaces, he testified that

I will say that I was—I thought that the entire bank facility at the downtown location was bank facility and that there was—

the board room upstairs, which we used on a regular basis for board activity, and I used for spreadsheet loan committee meetings and whatnot, was part of the bank. So I assumed all along that the mezzanine, the basement, and the whole operation was part of the bank.

Similarly, Mr. Call testified that he "would have understood that the term 'main banking facility' under the term of the lease would have included anything in the lease." When specifically asked if he "understood that the main banking facility included the mezzanine[,]" Mr. Call testified,

As it relates to that document [the LTA], I hadn't seen that document. But as it relates to the term 'main banking facility' as it's drawn up in a lease, I mean, you know, obviously, no, we did not occupy that space as the bank, but it was part of the lease.

Mr. Call further testified that "it's common sense if you don't renew your lease and you have no intentions of coming back, then you leave.... So that would mean to me from a layman, not a lawyer, that I vacate the premises that is under the terms of that lease." He also testified that

if I give up a lease, it's my understanding that I give up the whole lease. I have no idea, to be honest, why you all are even here, because you have a sublease that is underneath a lease. And, again, that's what you all are arguing about. But my point is, yes, I certainly wasn't going to—I wanted to give it all up. If I could work out something with the drive-in, that's fine. But I wasn't going to say, 'Okay, we want to keep the mezzanine,' for instance, or 'We want to just keep the basement or whatever.' My intention was to give up the lease. We were paying a lease payment that included everything.

Mr. Hardwick testified that before he signed the LTA on behalf of City, he was advised by Mr. Alderman, City's legal counsel, that both the LTA and drive-thru lease "were acceptable and that I had approval to

---

7. Old National Bank, predecessor in interest to City, was the original sublessor under the sub-   lease.

sign them. I would not have signed them otherwise[.]" Referring to the LTA, Mr. Alderman testified that Mr. Hankins had "produced a sufficient document." Indeed, according to Mr. Hankins, no one from City requested that any changes be made to the LTA prior to its execution.

City subsequently moved its banking facility out of the lobby of the St. James Building. However, Frazier & Oxley continued to occupy the mezzanine office spaces of the building.

### Frazier & Oxley I

When City did not renew its drive thru lease after the first year, FMC leased the lobby and later, the drive-thru facility, to Fifth Third Bank. Fifth Third also signed an option to lease the mezzanine,[8] which option it exercised sometime prior to October 2001. By letter dated October 26, 2001, FMC gave notice to Frazier & Oxley to vacate the mezzanine. The law firm refused and, as a result, FMC sought to evict Frazier & Oxley from the premises; accordingly, FMC filed a complaint against Frazier & Oxley in circuit court seeking immediate possession of the property and for damages. In turn, Frazier & Oxley filed a third-party complaint against City, its sublessor.

The circuit court granted partial summary judgment in favor of FMC and City and ordered the law firm " 'to vacate and quit the premises and immediately surrender possession to' " FMC. *Frazier & Oxley I*, 212 W.Va. at 279, 569 S.E.2d at 800. Thereafter, Frazier & Oxley filed a petition for writ of prohibition with this Court seeking to vacate and/or stay the circuit court's summary judgment order. Frazier & Oxley argued that under the terms of the prime lease, City "could have properly exercised its rights of termination or non-renewal by providing sixty

days notice, or, alternatively, by providing ninety days notice and paying a penalty." *Id.*, 212 W.Va. at 280, 569 S.E.2d at 801. Instead, the law firm argued, City and FMC "circumvented the express provisions of the lease by entering into a voluntary agreement for termination[,]" which resulted in City surrendering its leasehold. *Id.* According to Frazier & Oxley, because a surrender occurred and the prime lease neither terminated nor expired, the rights of the law firm as sublessee were not affected. *Id.*

This Court agreed with Frazier & Oxley insofar as it set forth the rights of a sublessee when a prime lease is surrendered rather than ending on its own terms. We defined "surrender" as, *inter alia,* "the giving up of a lease before its expiration." *Id.*, at syl. pt. 4, in part, 212 W.Va. at 277, 569 S.E.2d at 798, and determined that when a lessee surrenders a lease to his or her lessor, such surrender will not operate to defeat the rights of the sublessee. *Id.*, at syl. pt. 3. On the other hand, we noted, " 'the termination of the primary lease terminates the sublease.' " *Id.*, 212 W.Va. at 281, 569 S.E.2d at 802 (*quoting Cato v. Silling*, 137 W.Va. 694, 714, 73 S.E.2d 731, 743 (1952)). Accordingly, this Court granted Frazier & Oxley's petition for writ of prohibition and remanded the matter on the issue of whether City surrendered the prime lease to FMC, or whether the prime lease was terminated.[9]

### Frazier & Oxley II

On remand following *Frazier & Oxley I*, FMC filed a motion to amend its complaint against Frazier & Oxley to include the claim that the sublease was void against FMC because it was not recorded, and to add City as a first-party defendant alleging it failed to disclose the sublease and breached its con-

---

8. According to the circuit court's March 23, 2009, summary judgment order, Mr. Hankins wrote to his business partner that the lease with Fifth Third was " 'for the banking facility located on the first floor of the St. James Building.' " The circuit court further found that " '[t]he lease itself contained an option to 'lease the offices containing approximately 4,000 square feet on the mezzanine level presently leased to the law firm of Frazier and Oxley.' " For his part, Mr. Hankins testified that he would not have given Fifth Third an option to lease the mezzanine if he knew Frazier & Oxley was occupying the space pursuant to a sublease with City.

9. We subsequently found in *Frazier & Oxley II* "that if a subtenant consents to the surrender, the consented to surrender would terminate the sublease, but found that the settlement agreement between Frazier & Oxley and City National could not be construed as Frazier and Oxley's consent to a surrender." *Id.*, 214 W.Va. at 806, 591 S.E.2d at 732 (internal citations omitted).

tract with FMC. After the circuit court granted FMC's motion to amend, Frazier & Oxley and City sought relief in prohibition with this Court. We granted the writ, concluding that "our remand in *Frazier & Oxley I* was not a general remand opening all aspects of the case, but was a limited one encompassing only 'a factual determination of whether a surrender of the prime lease occurred.' " *Frazier & Oxley II*, 214 W.Va. at 811, 591 S.E.2d at 737. Thus, the circuit court's order allowing an additional "theory of recovery based on the recording act exceeded the limited remand in *Frazier & Oxley I*." *Id.*[10]

*Judgment Order after Frazier & Oxley II*

After this Court decided *Frazier & Oxley II*, the circuit court granted summary judgment in favor of Frazier & Oxley. In its judgment order entered March 10, 2004, the court concluded, *inter alia*, that the parties to the prime lease, FMC and City, voluntarily terminated the lease by mutual agreement and that, accordingly, there was a "surrender" of the lease because the lease "did not nonrenew, expire or terminate pursuant to its express terms and conditions.... As indicated by the Court in *Frazier & Oxley I*, 'City National Bank subleased part of the leased premises in the St. James Building to Frazier & Oxley; City National cannot now surrender the leased premises to [FMC] and thereby defeat the rights of the subtenant.' " As a result of the circuit court's order, the law firm continued to occupy the mezzanine space in the St. James Building. FMC did not appeal the circuit court's order.

*FMC's Breach of Contract
Claim against City*

Following the circuit court's order granting summary judgment in favor of Frazier & Oxley and against FMC in the eviction case, FMC filed a breach of contract claim against City on or about April 9, 2004, alleging City breached the terms of the Lease Termination Agreement. As indicated above, the LTA executed on September 27, 2000, by FMC and City, in relevant part, recounted that a lease agreement had been entered into "for that certain banking facility located on the ground floor and mezzanine located in the St. James Building at Tenth Street and Fourth Avenue[.]" The LTA further provided that "for and in consideration of the premises which are not mere recitals, but are an integral part of this agreement .... [t]hat certain lease ... dated November 1, 1979 is hereby terminated effective October 31, 2000, at which time possession of the main banking facility located within the St. James Building will be surrendered to" FMC.

In its complaint against City, FMC alleged, *inter alia*, that "[i]n the recitals of the Lease Termination Agreement, the 'banking facility' was described as the ground floor and mezzanine located in St. James" and that at the end of the October 31, 2000, term, "the Main Banking Facility would be vacated." The complaint further alleged that under the LTA, City "was to deliver to [FMC] possession of the main banking facility, which included the ground floor and Mezzanine which was occupied by [Frazier & Oxley], on November 1, 2000.... [FMC] has not received possession of part of the main banking facility known as the mezzanine as it is occupied by Frazier & Oxley."

Ultimately, the circuit court granted summary judgment, ruling on various legal theories in favor of City.[11] In its order entered March 23, 2009, the court determined, as an initial matter, that "the only issue remaining in this case is whether there was a surrender of the prime lease." It then concluded that the doctrine of collateral estoppel applies to bar FMC's breach of contract claim against City. The court further determined that,

---

**10.** We further recognized in *Frazier & Oxley II* that as a result of the granting of the writ precluding the filing of FMC's amended complaint, City was no longer a defendant in the eviction proceeding. *See Id.*, 214 W.Va. at 813 n. 17, 591 S.E.2d at 739 n. 17. ("[W]e need not consider issuing a separate writ on behalf of City National as City National is a party of this litigation only as a result of the now prohibited amended complaint.")

**11.** In that same order, the court also denied *Plaintiff's Motion for Entry of Order Delineating Justiciable Issues* and *Defendant's Motion to Dismiss for Failure to Prosecute under Rule 41*. Only that portion of the order granting City's motion for summary judgment was appealed and is presently before this Court.

even if collateral estoppel does not apply to bar FMC's breach of contract claim, City was excused from performing under the LTA because, having surrendered the prime lease, it was legally impossible for City to require Frazier & Oxley, its subtenant whose rights were not impacted by the surrender, to vacate the mezzanine.

The circuit court also found certain terms of the LTA to be ambiguous. Specifically, the LTA provided, in relevant part, that a lease agreement had been entered into "for *that certain banking facility* located on the ground floor *and mezzanine* located in the St. James Building[.]" (Emphasis added) The LTA further provided "[t]hat certain lease ... dated November 1, 1979 is hereby terminated effective October 31, 2000, at which time possession of the *main banking facility* located within the St. James Building will be surrendered to" FMC. (Emphasis added) The circuit court proceeded to construe the evidence against FMC as the party who drafted the LTA and to interpret the evidence as proving that Mr. Hankins drafted the agreement with the knowledge that Frazier & Oxley occupied the mezzanine offices pursuant to a sublease with City. The court concluded that "the LTA did not impose upon City a contractual obligation to surrender the mezzanine, which was occupied by Frazier & Oxley." [12]

It is from the circuit court's order granting summary judgment in favor of City that FMC now appeals.

## II. Standard of Review

■ In this appeal, we are asked to review a circuit court's entry of summary judgment. It is well established that " '[a] circuit court's entry of summary judgment is reviewed *de novo*.' Syllabus point 1, *Painter v. Peavy,* 192 W.Va. 189, 451 S.E.2d 755 (1994)." Syl. Pt. 1, *Toth v. Board of Parks and Recreation Com'rs,* 215 W.Va. 51, 593 S.E.2d 576 (2003). In conducting our *de novo* review, we apply the same standard utilized in the circuit court. Namely,

" ' " '[a] motion for summary judgment should be granted only when it is clear that there is no genuine issue of fact to be tried and inquiry concerning the facts is not desirable to clarify the application of the law.' Syllabus Point 3, *Aetna Casualty & Surety Co. v. Federal Insurance Co. of New York,* 148 W.Va. 160, 133 S.E.2d 770 (1963)." Syllabus Point 1, *Andrick v. Town of Buckhannon,* 187 W.Va. 706, 421 S.E.2d 247 (1992).' Syllabus point 2, *Painter v. Peavy,* 192 W.Va. 189, 451 S.E.2d 755 (1994)."

*Toth,* at syl. pt. 2, 215 W.Va. at 51, 593 S.E.2d at 576. Finally, we note that, " '[t]he circuit court's function at the summary judgment stage is not to weigh the evidence and determine the truth of the matter, but is to determine whether there is a genuine issue for trial.' Syllabus point 3, *Painter v. Peavy,* 192 W.Va. 189, 451 S.E.2d 755 (1994)." *Toth,* at syl. pt. 3, 215 W.Va. at 52, 593 S.E.2d at 577.

## III. Discussion

### *Collateral Estoppel*

■ We first address whether the circuit court properly applied the doctrine of collateral estoppel to bar FMC's breach of contract claim against City. In syllabus point three of *Holloman v. Nationwide Mut. Ins. Co.,* 217 W.Va. 269, 271, 617 S.E.2d 816, 818 (2005), this Court recognized that four conditions must be satisfied in order for collateral estoppel to foreclose a claim for damages:

'Collateral estoppel will bar a claim if four conditions are met: (1) The issue previously decided is identical to the one presented in the action in question; (2) there is a final adjudication on the merits of the prior action; (3) the party against whom the doctrine is invoked was a party or in privity with a party to a prior action; and (4) the party against whom the doctrine is raised had a full and fair opportunity to litigate the issue in the prior action.' Syllabus Point 1, *State v. Miller,* 194 W.Va. 3, 459 S.E.2d 114 (1995).

---

12. With almost no analysis, the circuit court also concluded that "there was no mutual mistake of fact or mutual mistake of law in this case." Because we find summary judgment to have been improperly granted on grounds other than the issues of mutual mistake of law or fact, it is not necessary that we address them in this opinion.

*See State v. Miller*, 194 W.Va. 3, 9, 459 S.E.2d 114, 120 (1995)("[C]ollateral estoppel requires identical issues raised in successive proceedings and requires a determination of the issues by a valid judgment to which such determination was essential to the judgment." (footnote and citations omitted)).

■ The circuit court determined that all of the conditions set forth in *Holloman* were satisfied such that collateral estoppel applied to bar FMC's claim. We disagree. Indeed, we find the first condition to be dispositive because the issue decided in the eviction proceeding is not identical to the breach of contract issue presented herein. In the present case, lessor FMC avers that City, its lessee, breached the terms of the parties' Lease Termination Agreement because, among other things, City failed to ensure that the office space occupied by its subtenant, Frazier & Oxley, was vacated at the end of the then current lease term. FMC contends that City knew in April 2000 that it would not be renewing the lease ending October 31, 2000, and that it had ample time to properly notify its subtenant, Frazier & Oxley. FMC argues that if City had given the law firm timely and proper notification of its intention not to renew the prime lease, Frazier & Oxley would have vacated the premises at the end of the then current lease term and a surrender would not have occurred.

In contrast, the issue decided in the eviction proceeding between FMC and Frazier & Oxley was solely that of surrender. In that case, the circuit court determined that, as a matter of law, City's surrender of the prime lease to FMC did not defeat the rights of City's subtenant, Frazier & Oxley. This Court is of the opinion that whether City failed to ensure that Frazier & Oxley vacated the mezzanine office space under the LTA and whether such failure was a breach of the terms of the LTA are issues entirely separate from the issue of City's surrender of the prime lease to FMC and the legal effect of that surrender on Frazier & Oxley. Because the first condition of collateral estoppel is not satisfied, it does not apply to bar FMC's breach of contract claim against City. Accordingly, it was error for the circuit court to conclude that FMC's breach of contract claim

was barred by the doctrine of collateral estoppel.

### Impracticability of Performance

Next, we address whether the circuit court erred in concluding that City was entitled to summary judgment even if collateral estoppel did not apply to foreclose FMC's breach of contract claim against City. According to the circuit court, "City cannot be found to have breached the LTA by failing to perform an act that it was prohibited by the law of surrender from performing." In other words, because it was determined in the eviction case that surrender of the prime lease terminated City's rights as sublessor, City had no legal right to remove Frazier & Oxley as a subtenant or to deliver the mezzanine office space to FMC; thus, any provision in the LTA which may or may not require City to deliver the mezzanine space occupied by Frazier & Oxley is unenforceable. For this reason, the circuit court concluded that City's nonperformance under the LTA is excused.

In this appeal, FMC contends that under the doctrine of impracticability, genuine issues of material fact exist as to whether City's performance under the LTA was legally prohibited as a result of the surrender of the prime lease, and as such, the circuit court erred in granting summary judgment on this issue. We agree.

■ In syllabus point two of *Waddy v. Riggleman*, 216 W.Va. 250, 252, 606 S.E.2d 222, 224 (2004), this Court established four requirements that must be satisfied for the doctrine of impracticability to apply, thereby excusing a party's promised performance under a contract:

> Under the doctrine of impracticability, a party to a contract who claims that a supervening event has prevented, and thus excused, a promised performance must demonstrate each of the following: (1) the event made the performance impracticable; (2) the nonoccurrence of the event was a basic assumption on which the contract was made; (3) the impracticability resulted without the fault of the party seeking to be excused; and (4) the party has not agreed,

either expressly or impliedly, to perform in spite of impracticability that would otherwise justify his nonperformance.

■ From our review of the record, we find, at the very least, that there are genuine issues of material fact regarding whether surrender of the prime lease resulted without the fault of City (the third requirement).[13] For example, according to the testimony of City's Matthew Call and Robert Hardwick, by April 25, 2000, City had decided and also unequivocally informed FMC that it would not be renewing the prime lease at the end of the current lease term. We recognize that although City was required under the prime lease to give FMC sixty days written notice of its intent not to renew, it is undisputed that FMC voluntarily accepted verbal notice. However, City had both a sublease and settlement agreement with Frazier & Oxley, the latter of which provided, in relevant part, that the term of the sublease shall be concurrent with the term of the prime lease, " 'or any extensions or renewals thereof, and shall expire ... upon the expiration or termination of the master/primary lease' " [i.e., prime lease]. *Frazier & Oxley I*, 212 W.Va. at 278, 569 S.E.2d at 799. Despite the existence of these agreements, City did not notify its subtenant that it intended to end the prime lease even though there was ample time for it to give proper written notice such that a surrender would not have occurred. For its part, FMC contends it was unaware that City and Frazier & Oxley had entered into a sublease or a settlement agreement when the Lease Termination Agreement was executed.

We find that the circuit court improperly weighed the evidence when it is clear that genuine issues of material fact exist as to whether City's performance under the LTA was rendered impracticable as a result of the surrender of the prime lease. Thus, it was

error for the circuit court to grant summary judgment in favor of City on this issue.[14]

### Ambiguity in the Lease Termination Agreement

The final issue for our review concerns an ambiguity in the Lease Termination Agreement executed on September 27, 2000. As indicated above, the LTA recounted, in relevant part, that a lease agreement had been entered into "for that *certain banking facility* located on the *ground floor and mezzanine* located in the St. James Building at Tenth Street and Fourth Avenue[,]" and further, that "for and in consideration of the *premises which are not mere recitals, but are an integral part* of this agreement .... [t]hat certain lease ... dated November 1, 1979 is hereby terminated effective October 31, 2000, at which time possession of the *main banking facility* located within the St. James Building will be surrendered to" FMC. (Emphasis added) With regard to the foregoing, the circuit court determined that

> [a]n ambiguity arises as to what is the 'main banking facility' as opposed to a 'certain banking facility.' A clear use of language would have repeated the word 'certain' a second time, or would have used the word 'main' both times and repeated the inclusion of the mezzanine in both instances. By defining the scope of the lease of 'that certain banking facility' as including 'the ground floor and mezzanine' in the beginning of the LTA, but referring to the 'surrender' of only the 'main banking facility,' [FMC], as drafter of the LTA, created an ambiguity.

Having determined the LTA was ambiguous, the court proceeded to consider evidence extrinsic to the agreement and to construe the ambiguity against FMC, the party who prepared it. The court ultimately concluded that "the LTA did not impose upon City a contractual obligation to surrender the mez-

---

13. Though the doctrine of impracticability and its requirements were clearly established by this Court in *Waddy*, the circuit court did not address or otherwise consider them in its summary judgment order.

14. FMC also argues that if this Court concludes that the trial court correctly applied the doctrine

of impracticability, then it was error for the court to dismiss the case without ordering City to return FMC to its pre-contract status. In light of our holding that summary judgment was improperly granted on the issue of impracticability of performance, we need not address FMC's argument regarding its pre-contract status.

zanine, which was occupied by Frazier & Oxley."

On appeal, FMC agrees with the circuit court that certain terms of the LTA are ambiguous. However, FMC contends that, considering the conflicting evidence as to the meaning of the ambiguous terms in the LTA, the ambiguity should have been resolved by a jury.

██ In past cases, this Court has held that "[w]here a contract is ambiguous, then issues of fact arise and a summary judgment is ordinarily not proper." Syl. Pt. 2, *Lee Enterprises, Inc. v. Twentieth Century–Fox Film Corp.,* 172 W.Va. 63, 64, 303 S.E.2d 702, 703 (1983). *See* Syl. Pt. 1, *Ohio Valley Contractors, Inc. v. Board of Educ. of Wetzel County,* 182 W.Va. 741, 391 S.E.2d 891 (1990); Syl. Pt. 2, *Glenmark Associates, Inc. v. Americare of W. Va., Inc.,* 179 W.Va. 632, 633, 371 S.E.2d 353, 354 (1988); Syl. Pt. 2, *Buckhannon Sales Co. v. Appalantic Corp.,* 175 W.Va. 742, 743, 338 S.E.2d 222, 223, (1985). We further held in syllabus point one of *Lee Enterprises* that

> '[w]hile the general rule is that the construction of a writing is for the court; yet where the meaning is uncertain and ambiguous, parol evidence is admissible to show the situation of the parties, the surrounding circumstances when the writing was made, and the practical construction given to the contract by the parties themselves either contemporaneously or subsequently. If the parol evidence be not in conflict, the court must construe the writing; *but, if it be conflicting on a material point necessary to interpretation of the writing, then the question of its meaning should be left to the jury* under proper hypothetical instructions.' Syllabus Point 4, *Watson v. Buckhannon River Coal Co.,* 95 W.Va. 164, 120 S.E. 390 (1923).

172 W.Va. 63, 64, 303 S.E.2d 702, 703. (Emphasis added) *See* Syl. Pt. 11, *Poling v. Pre-Paid Legal Services, Inc.,* 212 W.Va. 589, 592, 575 S.E.2d 199, 202 (2002); Syl. Pt. 1, *Leasetronics, Inc. v. Charleston Area Medical Center, Inc.,* 165 W.Va. 773, 271 S.E.2d 608 (1980); Syllabus, *McShane v. Imperial Towers, Inc.,* 165 W.Va. 94, 267 S.E.2d 196 (1980).

██ In this case, we agree with FMC that there are genuine issues of material fact regarding the use of the phrases "main banking facility" and "certain banking facility" in the LTA such that parol evidence concerning their interpretation should be considered and resolved by a jury. FMC contends that the LTA was intended to terminate the prime lease in its entirety and was not drafted to exclude the mezzanine from City's obligation to vacate. FMC's John Hankins testified that when the LTA was drafted, he was not aware that the law firm occupied the mezzanine pursuant to a sublease, but rather, he believed Messrs. Frazier and Oxley were permitted to use the offices because they were directors and board members of the bank. In contrast, City argues that, in fact, FMC knew of the subtenancy relationship, a fact it denoted on floor plans prepared for prospective tenants. Mr. Hankins explained, however, that the law firm's occupancy on the mezzanine appeared on floor plans because, considering it was already in the space, FMC considered the firm to be a prospective tenant after the prime lease ended. FMC notes further that City's Matthew Call testified that it was his intention to give up the entire lease, even the space the bank was not occupying (i.e., the mezzanine). City's Robert Hardwick similarly testified that he "assumed all along that the mezzanine, the basement, and the whole operation was part of the bank."

City argues, however, that the August 23, 2000, letter from Mr. Hankins to Mr. Hardwick, advising that FMC would take responsibility for negotiating a "new lease" for Frazier & Oxley after the prime lease ended shows that FMC knew that the law firm was occupying the mezzanine pursuant to a sublease. Mr. Hankins testified that his letter referred to the possibility of a "new" lease because he was unaware that one already existed.

As the foregoing demonstrates, there are clearly genuine issues of fact which are material to the question of how the ambiguity in the LTA should be resolved. Thus, the cir-

cuit court erred in weighing the evidence and in granting summary judgment in favor of City.

## IV.   Conclusion

■ Based upon all of the above, the summary judgment order entered March 23, 2009, in the Circuit Court of Cabell County, is hereby reversed and this case is remanded for further proceedings.[15]

Reversed and remanded.

---

**15.** City also argues that the doctrine of *res judicata* should apply to prohibit any recovery by FMC. In that City did not raise this issue before the trial court, this Court will not address it for the first time on appeal. *See Kronjaeger v. Buckeye Union Ins. Co.*, 200 W.Va. 570, 585, 490 S.E.2d 657, 672 (1997) ("We frequently have held that issues which do not relate to jurisdictional matters and which have not been raised before the circuit court will not be considered for the first time on appeal to this Court."); Syl. pt. 2, *Trent v. Cook*, 198 W.Va. 601, 602, 482 S.E.2d 218, 219 (1996) ("'[T]he Supreme Court of Appeals is limited in its authority to resolve assignments of nonjurisdictional errors to a consideration of those matters passed upon by the court below and fairly arising upon the portions of the record designated for appellate review'".(internal citation omitted)); *Barney v. Auvil*, 195 W.Va. 733, 741, 466 S.E.2d 801, 809 (1995) ("Our general rule is that nonjurisdictional questions not raised at the circuit court level, but raised for the first time on appeal, will not be considered.")