IN THE SUPREME COURT OF APPEALS OF WEST VIRGINIA

January 2021 Term

_____

No. 20-0155

_____

FILED
**April 16, 2021**
released at 3:00 p.m.
EDYTHE NASH GAISER, CLERK
SUPREME COURT OF APPEALS
OF WEST VIRGINIA

TRIPLE 7 COMMODITIES, INC.,
Defendant/Counterclaim Plaintiff Below, Petitioner

v.

HIGH COUNTRY MINING, INC., WOODROW W. CHURCH, and
DARREN J. SPENCER,
Plaintiffs/Counterclaim Defendants Below, Respondents

_____

Appeal from the Circuit Court of Mercer County, West Virginia
The Honorable Mark Wills, Judge
Civil Action No. 17-C-77-MW

AFFIRMED
_____

Submitted:  March 2, 2021
Filed:  April 16, 2021

Nicholas S. Preservati, Esq.
Nicholas P. Mooney, Esq.
Spilman Thomas & Battle, PLLC
Charleston, West Virginia
Counsel for Petitioner

William H. Sanders, III, Esq.
Sanders & Austin
Princeton, West Virginia
Counsel for Respondents

JUSTICE WOOTON delivered the Opinion of the Court.

SYLLABUS BY THE COURT

1.      "In reviewing challenges to the findings and conclusions of the circuit court, we apply a two-prong deferential standard of review. We review the final order and the ultimate disposition under an abuse of discretion standard, and we review the circuit court's underlying factual findings under a clearly erroneous standard. Questions of law are subject to a *de novo* review."  Syl. Pt. 2, *Walker v. W. Va. Ethics Comm'n*, 201 W. Va. 108, 492 S.E.2d 167 (1997).

2.      Where the issue of the enforceability of a settlement agreement requires the lower court to make findings of fact and apply contractual or other legal principles, this Court will review its order and the ultimate disposition under an abuse of discretion standard, its underlying factual findings under a clearly erroneous standard, and questions of law pursuant to a de novo review.

3.      "The law favors and encourages the resolution of controversies by contracts of compromise and settlement rather than by litigation; and it is the policy of the law to uphold and enforce such contracts if they are fairly made and are not in contravention of some law or public policy."  Syl. Pt. 1, *Sanders v. Roselawn Mem'l Gardens*, 152 W. Va. 91, 159 S.E.2d 784 (1968).

4.      When the performance of one party to a contract is due before that of the other party, an uncured failure of performance by the former discharges the latter's duty

i

of performance only if the failure is material. If the prior nonperformance was slight or did not go to the essence of the contract, the nonbreaching party is not relieved of its duty of performance.

5.    In determining whether a party's nonperformance under a contract is material for purposes of excusing the other party's subsequent performance, the following circumstances are significant:  (1) the extent to which the injured party will be deprived of the benefit which it reasonably expected; (2) the extent to which the injured party can be adequately compensated for the part of that benefit of which it will be deprived; (3) the extent to which the party failing to perform or to offer to perform will suffer forfeiture; (4) the likelihood that the party failing to perform or to offer to perform will cure its failure, taking account of all the circumstances including any reasonable assurances; and (5) the extent to which the behavior of the party failing to perform or to offer to perform comports with standards of good faith and fair dealing.

6.    "Contract language is considered ambiguous where an agreement's terms are inconsistent on their face or where the phraseology can support reasonable differences of opinion as to the meaning of words employed and obligations undertaken." Syl. Pt. 6, *State ex rel. Frazier & Oxley, L.C. v. Cummings*, 212 W. Va. 275, 569 S.E.2d 796 (2002).

7. "The doctrine of unconscionability means that, because of an overall and gross imbalance, one-sidedness or lop-sidedness in a contract, a court may be justified in refusing to enforce the contract as written. The concept of unconscionability must be applied in a flexible manner, taking into consideration all of the facts and circumstances of a particular case." Syl. Pt. 12, *Brown ex rel. Brown v. Genesis Healthcare Corp.*, 228 W. Va. 646, 724 S.E.2d 250 (2011), *judgment vacated on other grounds sub nom. Marmet Health Care Ctr., Inc. v. Brown*, 565 U.S. 530 (2012).

8. "A determination of unconscionability must focus on the relative positions of the parties, the adequacy of the bargaining position, the meaningful alternatives available to the plaintiff, and 'the existence of unfair terms in the contract.'" Syl. Pt. 4, *Art's Flower Shop, Inc. v. Chesapeake and Potomac Tel. Co. of W. Va., Inc.*, 186 W. Va. 613, 413 S.E.2d 670 (1991).

9. "Procedural unconscionability is concerned with inequities, improprieties, or unfairness in the bargaining process and formation of the contract. Procedural unconscionability involves a variety of inadequacies that results in the lack of a real and voluntary meeting of the minds of the parties, considering all the circumstances surrounding the transaction. These inadequacies include, but are not limited to, the age, literacy, or lack of sophistication of a party; hidden or unduly complex contract terms; the adhesive nature of the contract; and the manner and setting in which the contract was formed, including whether each party had a reasonable opportunity to understand the terms

of the contract." Syl. Pt. 17, *Brown ex rel. Brown v. Genesis Healthcare Corp.*, 228 W. Va. 646, 724 S.E.2d 250 (2011), *judgment vacated on other grounds sub nom. Marmet Health Care Ctr., Inc. v. Brown*, 565 U.S. 530 (2012).

10. "Substantive unconscionability involves unfairness in the contract itself and whether a contract term is one-sided and will have an overly harsh effect on the disadvantaged party. The factors to be weighed in assessing substantive unconscionability vary with the content of the agreement. Generally, courts should consider the commercial reasonableness of the contract terms, the purpose and effect of the terms, the allocation of the risks between the parties, and public policy concerns." Syl. Pt. 19, *Brown ex rel. Brown v. Genesis Healthcare Corp.*, 228 W. Va. 646, 724 S.E.2d 250 (2011), *judgment vacated on other grounds sub nom. Marmet Health Care Ctr., Inc. v. Brown*, 565 U.S. 530 (2012).

WOOTON, J.:

This is an appeal from an order of the Circuit Court of Mercer County appointing a special commissioner to execute a reformation deed in consummation of the parties' Confidential Settlement Agreement and Mutual Release (the "Agreement") and dismissing the action in its entirety. The circuit court found that the failure of respondents High Country Mining, Woodrow W. Church, and Darren J. Spencer (collectively "High Country") to timely release the notice of lis pendens pertaining to the action, as required under the Agreement, did not constitute a material "first breach" of the Agreement, and that High Country did not waive its right to enforcement of the Agreement's terms. The court further found that the Agreement and its subsequent extensions were neither procedurally nor substantively unconscionable.

After careful review of the briefs of the parties, their oral arguments, the appendix record and the applicable law, we find that the circuit court committed no error in enforcing the Agreement and subsequent extensions by appointing a special commissioner to execute a reformation deed pursuant to the Agreement's terms and dismissing the action in its entirety. We therefore affirm the circuit court's October 2, 2019 order.

1

# I. FACTS AND PROCEDURAL HISTORY

In 2016, petitioner Triple 7 Commodities, Inc. ("Triple 7") entered into a joint venture agreement with High Country for the purpose of taking over Wellston Coal's mining operations; the joint venture agreement provided that its purpose was to "perform[] and complet[e] the purchase of Wellston Coal property and sales of contracts to end buyers[.]" The agreement further provided for the parties to share profits on a 51/49 basis in favor of Triple 7. Subsequent to execution of this agreement, Triple 7 acquired a deed from Wellston for its mining properties and mineral interests, but the deed did not make High Country a co-grantee as allegedly contemplated under the joint venture agreement.

High Country filed the instant action seeking reformation of the deed making it a co-grantee and therefore co-owner of the Wellston minerals and permits. Triple 7 filed a counterclaim alleging breach of fiduciary, contractual, and statutory obligations. The case was litigated for two and a half years at which time the parties agreed to a settlement, which was memorialized in a Confidential Settlement Agreement and Mutual Release dated December 1, 2018.

## THE SETTLEMENT AGREEMENT

Paragraph 3.1 of the Agreement provided that Triple 7 was to pay High Country $600,000 within sixty days of the date of the Agreement in "full and final settlement of all Claims[.]" Paragraph 3.3 of the Agreement specifically provided that if Triple 7 timely paid the agreed settlement proceeds,

2

> the Parties agree that there **will not** be a reformation of the Deed to include High Country . . . as a co-grantee . . . to the Deed for any reason[] . . . [and that] Triple 7 will continue to own one hundred percent (100%) of the rights conveyed to Triple 7, its successors and assigns, in the Deed[] . . . [and] all mining-related permits for the mineral rights, which are the subject of, and defined in the Deed[.]

If, however, Triple 7 failed to make timely payment of the settlement proceeds, Paragraph 3.2 contained a default provision, which provided for reformation of the deed in lieu of payment of the settlement proceeds:

> **3.2 Non-Payment of Settlement Payment.** If the Settlement Payment is not made within sixty (60) calendar days of the Effective Date of this Agreement, Triple 7 agrees to a reformation of the Deed to include High Country [] as a co-grantee of forty-nine percent (49%) of the rights that were conveyed, sold, and granted to Triple 7 as part of the Deed between Triple 7 and Wellston Coal, LLC . . . [and] to cooperate and assist High Country with its attempt(s) to be added as a co-grantee of forty-nine percent (49%) to any mining-related permits[.]

(hereinafter the "default reformation provision"). Pertinent to the issues herein, the Agreement further specifically required High Country to release a notice of lis pendens filed pertaining to the action:

> **5. Discharge and Release of Liens/Lis Pendens.** *Within fifteen (15) calendar days of the Effective Date of this Agreement*, High Country . . . agree[s] to release and discharge any and all liens or claims of title filed against the Deed, the mining-related permits or the mineral rights which are the subject of, and defined in, the Deed including, without limitation, the Notice of Lis Pendens, dated July 28, 2017 (filed July 31, 2017), and filed in the office of the Clerk of McDowell

3

County, West Virginia in the Lis Pendens Book 0002, page 0292.

(emphasis added).

The Agreement also contained multiple release provisions. Paragraph 9.1 entitled "Mutual Releases of the Parties," provided that "[e]ffective *upon receipt of Triple 7's Settlement Payment,*" the parties "mutually, fully and forever, release one another . . . from any and all Claims[.]" (Emphasis added). Paragraph 9.2, entitled "High Country Releases," provided, however, that

> *[u]pon execution of this Agreement by all Parties*, High Country . . . "forever discharge[s], relinquish[es], disclaim[s] and/or release[s] any current or future claim or Claims to be a co-grantee or joint owner of the Deed; and any claim or Claims of ownership or title of the mining-related permits, the mineral rights . . . or any other rights conveyed . . . through the Deed.

(emphasis added). The Agreement further provided that the parties agreed to dismiss the case with prejudice within five calendar days of "payment of the Settlement Payment[.]" Other pertinent provisions included 1) a stipulation that the parties' "relationships and agreements" were to be "governed by this Agreement on a going forward basis as of the Effective Date"; 2) that the Agreement was "bargained for and entered into in good faith and as a result of arms-length negotiations"; 3) that the settlement amount "constitutes a fair and reasonable settlement" of the claims "based on [the parties'] respective individual

4

and independent assessments, with the assistance and advice of counsel,[1] of the probability of success, the complexity, the delay in obtaining relief, and the expense of litigation"; and 4) that the Agreement "was made freely and was not made under duress or coercion." (Footnote added).

THE EXTENSIONS

Triple 7 did not pay the settlement amount by the original deadline. As a result, the parties negotiated three subsequent "extensions" to the Agreement, each of which increased the gross settlement proceeds and provided additional time for Triple 7 to tender the settlement proceeds. Each extension was accompanied by an "extension fee," an increase to the settlement amount, and a written "Extension[s] to Confidential Settlement Agreement and Mutual Release," incorporating the new terms and providing that all other terms remained as stated in the original Agreement. Although the parties' briefs and the circuit court's order all differ slightly and/or are unclear as to the precise breakdown of extension fees and settlement proceeds as characterized in each extension, the parties appear essentially to agree that the initial settlement amount of $600,000

---

[1] In fact, the agreement states that it was "jointly drafted . . . with the benefit of advice from counsel" and that "none of the Parties will claim that any ambiguity in this Agreement shall be construed against any of the other Parties."

escalated to $3.6 million by way of additional settlement amounts and extension fees, only $900,000 of which was paid during the extension period.[2]

As indicated, each agreed extension was reduced to writing and signed by the parties, setting forth in detail the payments missed, the additional sums agreed upon, and the new deadlines. Each reiterated—in roughly equivalent language[3]—that the settlement proceeds continued to be for the purpose of "resolv[ing] the claims" in the "Complaint and Counter-Complaint" and that if the new sums were not timely paid, High Country would "have all of the rights and remedies provided under paragraphs 3.1 and 3.2 of the original Settlement Agreement[,]" i.e. the default reformation provision.[4] The extensions further stated that "all other terms and conditions of that Confidential Settlement Agreement and Mutual Release entered into between the Parties on December 1, 2018, shall remain in full force and effect."

The third extension included one critical change to the default reformation provision. Under this extension, in the event Triple 7 did not make timely payment of the

---

[2] The parties disagree about how much was actually paid toward the settlement amount over the course of the extensions. However, we find that the precise breakdown of each extension and payments tendered is ultimately immaterial to resolution of the issues at hand.

[3] The wording differed slightly in each, but to the same effect.

[4] The second and third extensions further provided that in the event of default, High Country "shall be entitled to retain any amounts paid to them prior to the date of the failure by Triple 7 to make any of said payments[.]"

6

settlement proceeds, High Country would be entitled to a reformation deed containing a

51/49 split of ownership *in favor of High Country*:

> [I]n the event of <u>any</u> such default by Triple 7, High Country []
> shall be entitled to have a Quitclaim Deed issued to them by
> William H. Sanders, III, acting as Special Commissioner . . .
> with High Country [] being granted ownership of 51% of all
> mineral rights, permits and any and all rights and duties
> conveyed by said Deed from Wellston Coal . . . and with Triple
> 7 being granted a forty-nine percent (49%) ownership share[.]

Triple 7 ultimately failed to make timely payment under the third extension and this

litigation ensued.[5]


THE LIS PENDENS

As indicated above, the Agreement contained a provision requiring High

Country to release its notice of lis pendens within fifteen days of the effective date of the

Agreement. However, High Country failed to timely release its notice of lis pendens,

which failure went unnoticed until Triple 7 was in the process of obtaining financing for

one of the third extension's payments, at which time the lender requested a release. Mr.

Caldwell advised High Country's counsel of the absence of a recorded release; High

Country's counsel then immediately prepared and filed a document which purported to

---

[5] As to the third and final extension, Triple 7 had secured funding for $1.1 million upon release of the lis pendens and was in the process of obtaining the final installment of $1.8 million to "move forward" with the settlement, but requested "a few extra weeks" to do so. High Country declined the additional extension of time for the final installment and represents that it advised Triple 7 not to tender the $1.1 million since it would not agree to an additional extension for the final installment. Despite providing a detailed chart of alleged misstatements and misrepresentations contained in High Country's brief, Triple 7 did not specifically dispute these facts.

release the lis pendens on the basis that "the parties to said civil action hav[e] agreed to a settlement of all issues between them to their mutual satisfaction, said settlement having now been *partially* paid." (emphasis added). Subsequent to a deposition criticizing the language of the lis pendens, High Country filed an "Amended Release of Lis Pendens" which contained the above language but omitted the reference to the settlement having only been "partially" paid.

MOTION TO APPOINT SPECIAL COMMISSIONER

When Triple 7 failed to make payment in accordance with the terms of the third extension, High Country filed a motion for appointment of special commissioner to execute a reformation deed making High Country a co-grantee, pursuant to the default reformation provision of the Agreement. Triple 7 opposed the motion, claiming that High Country's failure to release the notice of lis pendens was the "first breach," relieving it from a continued duty to perform under the Agreement. It further argued that High Country waived its right to enforce the default reformation provision by virtue of the release language in the Agreement, which states that "[u]pon execution" of the Agreement, any such claim to reformation was waived. Finally, Triple 7 argued that the Agreement and subsequent extensions were both procedurally and substantively unconscionable and therefore unenforceable.

With respect to the lis pendens, Triple 7 argued that the unreleased notice created a cloud on the title and caused the difficulties it experienced obtaining financing to

8

pay the settlement amount. In an affidavit filed in opposition to the motion to appoint commissioner, Triple 7's president, Damian Caldwell, averred that "[p]otential lenders were concerned about the fact that the Lis Pendens remained on file and inquired whether the loan proceeds Triple 7 sought would resolve all differences with Plaintiffs and result in a release of the Lis Pendens." The affidavit stated further that "Triple 7 could not guarantee that Plaintiffs would release the Lis Pendens," and that "[a]s a result of the Lis Pendens not being released, Triple 7 was not provided with the funding it sought." Finally, the affidavit provided that "[a]t least two loan brokers" reviewed the release and advised "they did not believe it [was] a complete release[]" and "[a]s a result, they refused to lend funds to Triple 7."

Triple 7 offered no testimony or affidavit from either broker or from any lender to the effect that the lis pendens was the impediment to obtaining financing, relying instead on the testimony and affidavit of Mr. Caldwell. High Country countered with Mr. Caldwell's deposition testimony stating that he told each lender about the lawsuit and settlement and that the settlement funds were to be paid from the loan proceeds.[6] When

---

[6] Mr. Caldwell testified as follows:

> A.     Every[] [lender] I spoke to, at that point, was made aware of the lawsuit.
>
> Q.     So you had told them that there was an outstanding lawsuit, and . . . also, told them that there were some agreed settlement amounts that needed to be satisfied. Is that correct?

(continued . . .)

9

asked which lenders told him that the reason they would not provide financing was the unreleased lis pendens, Mr. Caldwell replied, "I have not had a conversation that I could relay to you about that." When asked whether anyone "came out and told you that that's the reason that they wouldn't loan you any money," Mr. Caldwell simply replied, "It's been my experience that lenders don't specify every detail. They just tell you that they decline."

The circuit court granted the motion and dismissed the matter—including Triple 7's counterclaim—from the docket. In a detailed and thorough order the circuit court concluded that High Country's failure to record a release of the notice of lis pendens was not a material breach sufficient to trigger application of the "first breach" doctrine, which would relieve Triple 7 from performance. The court further found that the release

---

A.    That is correct.

Q.    I assume that the understanding between you and that lender would be that that was just a part of what the money would be used for if they did loan money to you, right? [T]o satisfy that obligation and to clear title to the property?

A.    That would [be] part of user proceeds. Correct.

Q.    And they were aware of that? You made them aware of that. Is that correct?

A.    Yes.

The Agreement specifically permitted Triple 7 to disclose the terms of the agreement to its "banks, lenders, financial advisors, commercial real estate advisors, property management companies, and investment advisors who have a need or reason to know[.]"

language in the Agreement which stated that High Country released its claim for reformation of the deed "[u]pon execution of this Agreement" was ambiguous, and construed the Agreement to waive the right to a reformation deed only upon timely payment of the settlement proceeds. Finally, the court found that the Agreement and extensions—despite their escalating payment requirements—were neither procedurally nor substantively unconscionable. Accordingly, the circuit court granted the motion to appoint special commissioner and dismissed the case in its entirety.[7] This appeal followed.

## II. STANDARD OF REVIEW

We must first ascertain our standard of review, which none of the parties address. To do so, however, we must first properly frame the ruling by the circuit court. It is clear that although the order on appeal granted a motion to appoint a special commissioner, the circuit court's order had the effect of enforcing the settlement agreement reached by the parties. Historically, the Court has utilized a simple abuse of discretion standard when reviewing enforcement of settlement. *See DeVane v. Kennedy*, 205 W. Va. 519, 527, 519 S.E.2d 622, 630 (1999) ("[W]hen this Court undertakes the appellate review

---

[7] The court also denied High Country's motion to strike Mr. Caldwell's affidavit and comments made by counsel during the hearing, which rulings are not on appeal. Further, the circuit court's order dealt with claims of disparagement by High Country purportedly in violation of the Agreement. The circuit court found Triple 7 provided no evidence of disparagement and/or evidence that any alleged disparagement caused the funding to fail. Despite Triple 7's insistence that it "has not abandoned that argument," that finding is not assigned as error. Accordingly, we decline to address it.

of a circuit court's order enforcing a settlement agreement, an abuse of discretion standard of review is employed.").

However, the issues underlying enforcement of settlement in this matter require our review of both the circuit court's findings of fact and its application of basic tenets of contract law. In such instances the Court has found it more appropriate to apply our traditional multi-pronged standard of review, rather than a simple abuse of discretion standard, as set forth in Syllabus Point 2 of *Walker v. West Virginia Ethics Commission*, 201 W. Va. 108, 492 S.E.2d 167 (1997):

> In reviewing challenges to the findings and conclusions of the circuit court, we apply a two-prong deferential standard of review. We review the final order and the ultimate disposition under an abuse of discretion standard, and we review the circuit court's underlying factual findings under a clearly erroneous standard. Questions of law are subject to a *de novo* review.

*See Messer v. Huntington Anesthesia Grp., Inc.*, 222 W. Va. 410, 417, 664 S.E.2d 751, 758 (2008) (rejecting simple abuse of discretion standard for review of settlement enforceability and applying multi-pronged standard of review); *Certain Underwriters At Lloyd's, London, Subscribing To Policy No. B0711 v. Pinnoak Res., LLC*, 223 W. Va. 336, 341-42, 674 S.E.2d 197, 202-03 (2008) (utilizing multi-pronged standard of review where settlement agreement enforceability invoked application of contract principles).

Therefore, we now hold that where the issue of the enforceability of a settlement agreement requires the lower court to make findings of fact and apply

12

contractual or other legal principles, this Court will review its order and the ultimate disposition under an abuse of discretion standard, its underlying factual findings under a clearly erroneous standard, and questions of law pursuant to a de novo review. The Court is further mindful that "[t]he law favors and encourages the resolution of controversies by contracts of compromise and settlement rather than by litigation; and it is the policy of the law to uphold and enforce such contracts if they are fairly made and are not in contravention of some law or public policy." Syl. Pt. 1, *Sanders v. Roselawn Mem'l Gardens*, 152 W. Va. 91, 159 S.E.2d 784 (1968). With these standards and principles in mind, we proceed to the parties' arguments.

## III. DISCUSSION

Triple 7 asserts four assignments of error: 1) that the circuit court erred in its handling of the materiality requirement of the "first breach" doctrine; 2) that the circuit court erred in refusing to find waiver of the right to enforce the default reformation provision; 3) that the circuit court erred in not finding the Agreement unconscionable; and 4) that the circuit court deprived it of due process by dismissing its counterclaim.

### A. "FIRST BREACH" DOCTRINE

Triple 7 first argues that the circuit court erred in enforcing the Agreement where High Country had committed a material "first breach" by failing to timely release the notice of lis pendens, as required by the Agreement. While the parties summarily state that West Virginia observes the "first breach" doctrine, this Court has established no

13

modern iteration of the doctrine or factors for its application by way of syllabus point, notwithstanding antiquated caselaw briefly referencing its underlying principles. *See Blue v. Hazel-Atlas Glass Co.*, 106 W. Va. 642, 650, 147 S.E. 22, 26 (1929) ("The party to a contract is guilty of the first breach who fails to do what he contractually is bound to do."); *Reiser v. Lawrence*, 96 W. Va. 82, 84, 123 S.E. 451, 452 (1924) ("Where the evidence clearly shows that defendant was the first to breach the contract, the court may rightfully reject an instruction based on the theory that plaintiff first breached the contract and thereby excused further performance thereof by defendant.").[8]

Regardless, we find that nearly every state in the country recognizes the first breach doctrine and has had occasion to apply it with some frequency. Most have adopted some version of the doctrine stated as follows: "As a rule, a party first guilty of a substantial or material breach of contract cannot complain if the other party subsequently refuses to perform. In other words, a party is barred from enforcing a contract that it has materially breached." 17A Am. Jur. 2d *Contracts* § 589 (footnotes omitted); *see also Restatement (Second) of Contracts* § 237 (1981) ("[I]t is a condition of each party's remaining duties to render performances to be exchanged under an exchange of promises that there be no

---

[8] In addition to this early caselaw, the Court briefly referenced the doctrine in a recent memorandum decision. *See Standard Oil Co., Inc. v. Consolidation Coal Co.*, No. 15-0655, 2016 WL 6078570, at *4 (W. Va. Oct. 17, 2016) (memorandum decision) ("The gist of the doctrine of 'first breach' is that the 'party who commits the first breach of a contract is not entitled to enforce it, or to maintain an action thereon, against the other party for his subsequent failure to perform.'" (quoting *Hurley v. Bennett*, 176 S.E. 171, 175 (Va. 1934)).

14

uncured material failure by the other party to render any such performance due at an earlier time.").

The instant case more specifically invokes the "materiality" aspect of the rule which has been characterized as an "exception to the [first breach doctrine] . . . when the breach did not go to the essence of the contract, but only to a minor part of the consideration." 17A Am. Jur. 2d *Contracts* § 589. That is, only material breaches will satisfy the doctrine and permit a nonbreaching party to escape its subsequent performance requirements. As discussed in one of the leading authorities on contracts:

> [M]odern courts and the Restatement Second recognize that something more than a mere default is ordinarily necessary to excuse the other party's performance in the typical situation . . . . [A]n uncured failure of performance by the former can suspend or discharge the latter's duty of performance only if the failure is material or substantial. Thus, if the prior breach of contract was slight or minor, as opposed to material or substantial, the nonbreaching party is not relieved of its duty of performance although it may recover damages for the breach.

14 Samuel Willison & Richard A. Lord, *A Treatise on the Law of Contracts* § 43:5 (4th ed. 2013) (footnotes omitted) (hereinafter "*Williston on Contracts*"). As is the case with the doctrine itself, in our precedents this materiality element has only been referenced in dated caselaw or in dicta. *See* Syl. Pt. 2, *J.W. Ellison, Son & Co. v. Flat Top Grocery Co.*, 69 W. Va. 380, 71 S.E. 391 (1911) ("Where a purchaser of chattels has right to rescind the contract for breach of it, the breach must be in a material matter."); *W. Va. Human Rights Comm'n v. Smoot Coal Co.*, 186 W. Va. 348, 353, 412 S.E.2d 749, 754 (1991) ("[O]nly a material failure of performance by one party discharges the other."). Accordingly, we now hold

15

that when the performance of one party to a contract is due before that of the other party, an uncured failure of performance by the former discharges the latter's duty of performance only if the failure is material. If the prior nonperformance was slight or did not go to the essence of the contract, the nonbreaching party is not relieved of its duty of performance.

In its first assignment of error, Triple 7 argues that High Country's failure to release the notice of lis pendens was a significant, material breach of the Agreement inasmuch as it was the first action required under the Agreement—within fifteen days of the effective date of the Agreement—and the *only* affirmative act required by High Country, which it breached almost immediately. It argues that the unreleased lis pendens hindered its efforts to obtain financing to fulfill its settlement obligations under the Agreement, which were expressly designed to permit it to maintain 100% ownership of the subject property.

The circuit court found, and High Country argues, that the release of the notice of lis pendens was not only ancillary to the settlement, but ultimately inconsequential in any event. High Country emphasizes that the lis pendens was not a "lien" on the property; rather, it was merely notice of a lawsuit—the existence of which Mr. Caldwell had already informed the lenders. It also notes that when the issue of the lis pendens release was first noticed by Mr. Caldwell, he was in the course of *successfully* obtaining funding for one of the final installments due under the third extension. High Country argues that Mr. Caldwell successfully obtained that funding with the lis pendens

16

still in place and requested additional time to pay the remaining payment due under the extension—demonstrating Triple 7's continued willingness to consummate the settlement despite the absence of a release.

With respect to the requirement that a performance-excusing breach be material, it has been stated that such materiality

> is ultimately a question of degree, which, it has been said, should be decided based on the inherent justice of the matter. Generally, [] nonperformance will attain this level of materiality only when it goes to the root, heart, or essence of the contract; or is of such a nature as to defeat the object of the parties in making the contract; or, as it has sometimes been said, when the covenant not performed is of such importance that the contract would not have been made without it.

*Williston on Contracts* § 43:6 (footnotes omitted). To make a deliberative assessment of the "materiality" factor, the circuit court carefully examined the factors contained in Section 241 of the *Restatement (Second) of Contracts*:

> In determining whether a failure to render or to offer performance is material, the following circumstances are significant:
>
> (a) the extent to which the injured party will be deprived of the benefit which he reasonably expected;
>
> (b) the extent to which the injured party can be adequately compensated for the part of that benefit of which he will be deprived;
>
> (c) the extent to which the party failing to perform or to offer to perform will suffer forfeiture;

17

(d) the likelihood that the party failing to perform or to offer to perform will cure his failure, taking account of all the circumstances including any reasonable assurances;

(e) the extent to which the behavior of the party failing to perform or to offer to perform comports with standards of good faith and fair dealing.

Triple 7 asserts that the circuit court erred in its consideration of all of these "significant circumstances," each of which we shall address in turn.

The first "significant circumstance" affecting materiality under Section 241 of the *Restatement* is the extent to which the allegedly injured party will be deprived of its expected benefit under the agreement. As to this factor, the circuit court concluded that Triple 7 was not deprived of the benefit it reasonably expected from the Agreement by High Country's temporary failure to release the lis pendens because the purpose of the Agreement was to resolve the litigation by settlement—a benefit which was still available to Triple 7 by consummating the Agreement under its existing terms. As to this factor, Triple 7 argues that the court erroneously adopted a rule pertaining to this factor whereby if a party is not "completely" deprived of benefit from the agreement, the breach is not material. Triple 7 further argues that it did not seek merely to settle the litigation, but that its overriding purpose in entering the Agreement was to establish terms under which it could maintain its 100% ownership of the subject property, an outcome of which it has now been deprived.

We find that Triple 7's characterization of the Agreement and its expected benefit somewhat obtusely ignores the design of the Agreement. The Agreement provided for settlement of the action in one of two ways: payment of the settlement proceeds, granting Triple 7 100% ownership free and clear of High Country's claims, or absent such payment, execution of a reformation deed resulting in shared ownership of the subject property. While Triple 7's *preferred* settlement alternative may have been to buy out High Country, it failed to demonstrate that the specifically negotiated alternative methods of settlement were no longer available to it.

The circuit court correctly concluded that the obvious primary purpose of the settlement agreement was to resolve the litigation under alternative terms which Triple 7 found acceptable at the time the Agreement was entered. The Agreement itself *repeatedly* expressed its purpose in successive paragraphs as being to

> fully and finally resolve any and all current or future . . . claims arising from their relationship . . . claims in the Mercer County Litigation . . . claims arising under the Joint Venture Agreement . . . claims . . . related to or contesting the ownership or title of the Deed held in Triple 7's name, the mining-related permits, or the mineral rights . . . [and] claims . . . related to or contesting the ownership or title of the mineral rights[.]

The Agreement further specifically defined the "Claims" to be resolved as including "any and all claims, counterclaims, cross-claims, and/or third-party claims, suits, complaints . . . defenses . . . causes of action . . . liabilities . . . damages . . . compensation . . . controversies, actions, judgments, or any other remedies or relief of any character whatsoever . . . ."

19

Moreover, the three subsequent extensions reiterated their purpose as being "to resolve the claims of High Country . . . as per said Complaint and Counter-Complaint filed in the Circuit Court of Mercer County, West Virginia."

In fact, the Agreement's intention to terminate the litigation and the parties' relationship was so emphatically expressed that the Agreement imbedded a contingency for non-payment of the negotiated settlement proceeds that would *still* resolve the litigation, but under different relief to High Country, i.e. reformation of the deed. Triple 7's loss of sole ownership of the property—the benefit of which it claims to have been deprived—is not the result of High Country's failure to record a release. It is the result of the specifically negotiated structure of the Agreement. In that regard, Triple 7's loss of sole ownership was occasioned solely by its failure to pay the settlement proceeds, which non-payment was a specifically contemplated and negotiated contingency. In fact, it entered into three successive extension agreements to avoid triggering the default reformation provision which would strip it of its sole ownership. More strikingly, in the final extension and despite the continuous difficulty it experienced obtaining financing, Triple 7 specifically negotiated away its *controlling* interest in the event of default for the express purpose of extending the Agreement and holding the parties to their agreement to fully resolve the litigation and end their relationship.

Most importantly as to this factor, however, Triple 7 failed entirely to demonstrate that the unreleased lis pendens impeded its ability to obtain financing to pay

the settlement proceeds which would have enabled it to consummate its preferred settlement option. Despite Mr. Caldwell's bald assertions, Triple 7 produced not a single witness or affidavit from what it claimed were *multiple* lenders that refused financing due to the presence of the notice of lis pendens. Without any evidence that the first breach affected Triple 7's ability to consummate the settlement through payment of the settlement proceeds, it has failed to prove that High Country's breach deprived it of any expected benefit. In fact, Triple 7 failed to demonstrate *any* real consequence of High Country's failure to timely release the notice of lis pendens, much less a deprivation of the benefit of its bargain.[9]

We therefore agree with the circuit court's analysis that the primary thrust of a settlement agreement is to resolve the underlying litigation and that the release of the lis pendens was not the purpose of this particular Agreement. It is well-understood that a notice of lis pendens is merely notice of a suit.[10] Mr. Caldwell himself had notified the

---

[9] Moreover, Triple 7's argument on this factor is circular: it claims that the expected benefit of which it was denied was 100% ownership of the property; however, the only way to obtain that benefit (free and clear of High Country's claims) was to tender the settlement funds and consummate the settlement. It argues the only way to obtain the settlement funds was for the property to be free of the notice of lis pendens and therefore have "clear title" for use as collateral. However, not until the litigation was settled and dismissed would the property be free of the "cloud" created by the litigation. As discussed *infra*, the notice of lis pendens itself creates no lien on the property.

[10] Admittedly, the requirement that the lis pendens be released within fifteen days of the Agreement suggests that its purpose was to aid in obtaining the financing to be sought by Triple 7. Regardless, Triple 7 failed to demonstrate that its presence interfered with obtaining financing. As the circuit court noted, there was a "plethora" of possible reasons why lenders would decline to provide financing to Triple 7.

lenders of the litigation, which served the same purpose as the lis pendens. He testified that he advised the lenders that the financing would be used to resolve the pending litigation, an obvious prerequisite to removing any cloud from the title irrespective of the filed notice of lis pendens itself. *See Brass Ring, Inc. v. Johnson*, No. 12-1496, 2013 WL 5967039, at *4 (W. Va. Nov. 8, 2013) (memorandum decision) ("[N]otice of *lis pendens* alone creates no lien or claim on the property."); *Ghent v. Meadowhaven Condo., Inc*., 823 A.2d 355, 361 (Conn. App. Ct. 2003) ("[L]is pendens is not an encumbrance or burden on the record title of the subject property."). Further, as the circuit court observed, the lawsuit of which it gave notice was not fully resolved through the mere release of the lis pendens; therefore, a release would have done nothing to clear the actual cloud on the title which was the pending litigation.

This first, largely determinative factor notwithstanding, Triple 7 contends that the circuit court further erred with respect to the remaining considerations set forth in the *Restatement*. However, we need not linger over the remaining factors inasmuch as we find they are either inconsequential to the analysis or weigh heavily in favor of the circuit court's conclusion that High Country's breach was not material.

The second enumerated "significant circumstance" under Section 241 of the *Restatement* is whether Triple 7 could be adequately compensated for the benefit of which it was deprived. Triple 7 contends that the circuit court conflated this factor with whether or not it proved actual damages stemming from High Country's nonperformance. It argues

22

that the injury it sustained as a result of High Country's breach was the loss of a controlling interest in the property, which interest is not quantifiable. In support, it notes that West Virginia recognizes specific performance as an equitable remedy due to the uniqueness of property, which cannot be compensated for in mere damages.

While the circuit court's order indeed references the lack of evidence as to "what the damages . . . would be," we find that Triple 7 misses the circuit court's broader reasoning as to this factor. The circuit court's order clearly states that "the fact that Triple 7 continued with the terms of the third Extension even after it was aware that the Notice of Lis Pendens had not been released, makes it apparent that there was no harm resulting from the failure to release the Notice of Lis Pendens." Therefore, commensurate with its finding as to the first factor, the circuit court found simply that there was no harm caused by the lack of release for which to "compensate" Triple 7. Its findings in that regard speak more to Triple 7's lack of injury in the first instance than the adequacy of its proof of damages. Indeed, the *Restatement* explains that this factor "is a corollary of the first [factor]." *Id*. § 241, cmt. c. Having correctly found that High Country's nonperformance deprived Triple 7 of no expected benefit under the Agreement, the circuit court likewise correctly found that the factor concerning adequacy of "compensation" available to Triple 7 does not bear in favor of the materiality of High Country's breach.

The remaining factors—whether High Country would suffer a forfeiture, High Country's ability to cure, and its good faith—likewise require little discussion. Triple

23

7 correctly notes that the forfeiture factor speaks to whether a party has already performed to an extent which would constitute a forfeiture should the other party be excused from performance. In this case, High Country forfeited nothing, having neither paid nor performed in any respect before Triple 7 defaulted. Therefore, this factor lends little to the analysis.

However, the ability to cure and good faith factors soundly weigh in favor of a lack of materiality. Triple 7 is dismissive of High Country's belated cure by filing the release upon request; it attempts to characterize High Country's failure to release the lis pendens as the first step toward subjecting it to a "shakedown"—the subsequent extensions, fees, and escalating settlement monies.[11] In response, High Country contends that it exhibited the utmost good faith by filing not one, but two, releases after being advised of its failure to do so. It further highlights its dealings with Triple 7 relative to the final extension as evidence of its good faith. High Country represents—and Triple 7 does not dispute[12]—that when Triple 7 asked for more time to pay the final installment of $1.8

_____

[11] Triple 7 also argues heavily that the language included in the initial release to the effect that the settlement was only "partially" paid was intentionally included in an attempt to "squeeze" Triple 7 for greater settlement amounts while the alleged cloud on the title remained. However, it is difficult to construe this wording as evidence of bad faith given that it was entirely accurate; Triple 7 had in fact only partially paid the settlement.

[12] *See* n.5, *supra*.

million, High Country's counsel advised Triple 7 not to make the $1.1 million payment it already had in hand because it did not intend to grant another extension.

As the circuit court correctly found, High Country immediately cured its nonperformance by preparing a release of the lis pendens upon being notified of its failure to do so and even provided an amended release when the release language was criticized by Mr. Caldwell. More importantly, Triple 7 failed to demonstrate that High Country's nonperformance was anything but an oversight, which it corrected immediately. And despite suggesting it was victimized by the subsequent extensions, Triple 7 failed to establish that it entered into the extensions with anything other than a full-throated endorsement of the parties' original Agreement and desire to maintain resolution of the litigation under such additional terms as necessary to finally resolve the matter.

In fact, Triple 7's continued willingness and affirmative actions toward consummating the settlement itself after becoming aware of High Country's failure to file a release likely constituted waiver of any alleged "first breach." It is well-established that "[i]f the [nonbreaching] party elects to continue with the contract, it cannot later suspend performance and then claim that it had no duty to perform based upon the first material breach. That defense is waived when the party elects to continue performance of the contract." *Maverick Benefit Advisors, LLC v. Bostrom*, 2016 382 P.3d 753, 759 (Wyo. 2016); *see also Atl. Bitulithic Co. v. Town of Edgewood*, 103 W. Va. 137, 143, 137 S.E.

25

223, 225 (1927) ("There is no breach so long as the injured party elects to treat the contract as continuing."). *Williston on Contracts* explains

> the general rule that one party's uncured, material failure of performance will suspend or discharge the other party's duty to perform does not apply when the latter party, with knowledge of the facts, either performs or indicates a willingness to do so, despite the breach, or insists that the defaulting party continue to render future performance.

§ 43:15 (footnotes omitted); *see also Restatement (Second) of Contracts* § 246 (1981) ("[A]n obligor's acceptance or his retention for an unreasonable time of the obligee's performance, with knowledge of or reason to know of the non-occurrence of a condition of the obligor's duty, operates as a promise to perform in spite of that non-occurrence[.]"). Here, it is undisputed that even after knowledge that the lis pendens had not yet been released, Triple 7 proceeded to successfully obtain funding for a portion of the final extension's settlement proceeds and attempted to tender those funds, requesting an additional extension of time for the final installment.

In sum, we agree with the circuit court's thorough and well-reasoned analysis of the materiality of High Country's breach and agree that any nonperformance by High Country was not a material breach relieving Triple 7 of its obligations under the Agreement. We likewise find that the factors set forth in the *Restatement* reflect an enumeration of the various circumstances which inform the issue of the materiality of a party's breach or nonperformance. Accordingly, we now hold that in determining whether a party's nonperformance under a contract is material for purposes of excusing the other

party's subsequent performance, the following circumstances are significant: (1) the extent to which the injured party will be deprived of the benefit which it reasonably expected; (2) the extent to which the injured party can be adequately compensated for the part of that benefit of which it will be deprived; (3) the extent to which the party failing to perform or to offer to perform will suffer forfeiture; (4) the likelihood that the party failing to perform or to offer to perform will cure its failure, taking account of all the circumstances including any reasonable assurances; and (5) the extent to which the behavior of the party failing to perform or to offer to perform comports with standards of good faith and fair dealing.[13]

WAIVER

Next, Triple 7 argues that because of the wording of one of the release paragraphs in the Agreement, High Country waived its right to seek reformation of the deed. Triple 7 points to paragraph 9.2 of the Agreement which provides that "[u]pon execution of this Agreement by all Parties, High Country . . . forever discharge[s], relinquish[es], disclaim[s], and/or release[s] any current or future claim or Claims to be a co-grantee or joint owner of the Deed[.]" Triple 7 argues that this language is unambiguous and clearly provides that when the parties executed the Agreement, High Country immediately waived its right to seek reformation of the deed. It argues further that

---

[13] As the *Restatement* cautions, however, "[a] determination that a failure is not material means only that it does not have the effect of the non-occurrence of a condition [excusing further performance]. Even if not material, the failure may be a breach and give rise to a claim for damages for partial breach[.]" *Restatement (Second) of Contracts* § 241 cmt. a.

27

paragraph 9.2 "supersedes" the mutual release language of paragraph 9.1, which is effective only upon payment of the settlement funds, because it is specific to High Country's agreement to release.

High Country reiterates the circuit court's conclusion that this singular phrase from one paragraph of the Agreement is ambiguous in light of the Agreement's other provisions and that it "should not have been included[.]" It contends that suggesting it released its right to reformation at the moment of execution of the Agreement without knowing whether Triple 7 would default on its payment obligation—particularly given that reformation was expressly permitted upon default—is "ludicrous." The circuit court, finding this provision ambiguous in light of the preceding release paragraph which states that the mutual releases are effective "upon receipt of Triple 7's Settlement Payment," concluded that the Agreement clearly contemplated releases only upon payment of the settlement proceeds or reformation of the deed.

We agree. With regard to inconsistent contractual terms, the Court has stated, "Contract language is considered ambiguous where an agreement's terms are inconsistent on their face or where the phraseology can support reasonable differences of opinion as to the meaning of words employed and obligations undertaken." Syl. Pt. 6, *State ex rel. Frazier & Oxley, L.C. v. Cummings*, 212 W. Va. 275, 569 S.E.2d 796 (2002). Further,

28

> [i]f an inquiring court concludes that an ambiguity exists in a contract, the ultimate resolution of it typically will turn on the parties' intent. Exploring the intent of the contracting parties often, but not always, involves marshaling facts extrinsic to the language of the contract document. When this need arises, these facts together with reasonable inferences extractable therefrom are superimposed on the ambiguous words to reveal the parties' discerned intent.

*Fraternal Order of Police, Lodge Number 69 v. City of Fairmont*, 196 W. Va. 97, 101 n.7, 468 S.E.2d 712, 716 n.7 (1996).

Unquestionably, the "mutual releases" provision, providing for release upon receipt of the settlement proceeds, and the "High Country release" provision, providing for release upon execution, are facially inconsistent. More importantly, it is patently obvious that this language seemingly forfeiting the ability to reform the deed upon the mere execution of the Agreement is fully at odds with the Agreement as a whole and as specifically negotiated. Reformation of the deed served as an alternative settlement resolution to the payment of the settlement proceeds; to construe that relief as "waived" from the outset of the Agreement is antithetical to the parties' expressed intentions. We therefore find that the circuit court properly construed the ambiguous provision to effectuate the parties' clear intention in settlement of the case.

UNCONSCIONABILITY

Next, Triple 7 claims that the Agreement and extensions are both procedurally and substantively unconscionable. In support, it focuses on the escalating

29

settlement amount, which it alleges was six and a half times the original settlement amount and demonstrates its unconscionability. It claims that High Country took advantage of its unawareness that the lis pendens had not been released to "extort" the additional sums and that it was "required" to agree to the extensions otherwise it "would lose a substantial interest in its property and, later, a controlling interest."

High Country responds that there was no inequity in the parties' bargaining positions as Mr. Caldwell has banking experience and is "financially [] experienced and more financially savvy" than High Country's principals. High Country submits that Triple 7 eagerly agreed to the settlement and subsequent extensions in an effort to protect its sole ownership of four million tons of metallurgical coal, which allegedly had a value far greater than the settlement amount of $3.6 million. The circuit court agreed and found that the Agreement and extensions were entered into with advice of counsel, by sophisticated parties, freely negotiated, and with no hidden terms. More specifically, the court found that the ultimate value of the metallurgical coal at issue (estimated at or around $100 million) well justified the escalating settlement amount.[14]

---

[14] Triple 7, however, adduced testimony at the summary judgment hearing that the price of metallurgical coal had actually fallen from the time the settlement agreement was first executed, as contrasted with the escalating settlement price. Regardless, Triple 7 itself makes abundantly clear that its desire to avoid the default reformation provision and retain 100% ownership provided its motivation to continue to agree to the extensions.

This Court has issued the following guidance on unconscionability:

> The doctrine of unconscionability means that, because of an overall and gross imbalance, one-sidedness or lop-sidedness in a contract, a court may be justified in refusing to enforce the contract as written. The concept of unconscionability must be applied in a flexible manner, taking into consideration all of the facts and circumstances of a particular case.

Syl. Pt. 12, *Brown ex rel. Brown v. Genesis Healthcare Corp.*, 228 W. Va. 646, 724 S.E.2d 250 (2011), *judgment vacated on other grounds sub nom. Marmet Health Care Ctr., Inc. v. Brown*, 565 U.S. 530 (2012). Further, "[a] determination of unconscionability must focus on the relative positions of the parties, the adequacy of the bargaining position, the meaningful alternatives available to the plaintiff, and 'the existence of unfair terms in the contract.'" Syl. Pt. 4, *Art's Flower Shop, Inc. v. Chesapeake and Potomac Tel. Co. of W. Va., Inc.*, 186 W.Va. 613, 413 S.E.2d 670 (1991).

We find that the circuit court correctly determined that the Agreement and extensions were not unconscionable—either procedurally or substantively. This Court has held that

> [p]rocedural unconscionability is concerned with inequities, improprieties, or unfairness in the bargaining process and formation of the contract[] . . . . includ[ing], but [] not limited to, the age, literacy, or lack of sophistication of a party; hidden or unduly complex contract terms; the adhesive nature of the contract; and the manner and setting in which the contract was formed, including whether each party had a reasonable opportunity to understand the terms of the contract.

31

Syl. Pt. 17, in part, *Brown*, 228 W. Va. 646, 724 S.E.2d 250. None of these considerations are present here. As per the language of the Agreement itself, it was "made freely and . . . [without] duress or coercion"; it was "bargained for and entered into in good faith and as a result of arms-length negotiations . . . based on [the parties'] respective individual and independent assessments, with the assistance and advice of counsel,[15] of the probability of success, the complexity, the delay in obtaining relief, and the expense of litigation."[16] Further, any suggestion of procedural unconscionability relative to the terms of the settlement and manner of formation is completely undermined by the serial nature of the negotiations. The terms of the original Agreement were highly detailed; each extension cautiously carved out new or additional terms and diligently reserved the original terms as set forth in the lengthy and exhaustive original Agreement. The fact that the extensions were successively negotiated following extended periods of time during which the parties would reconvene and revisit their agreement, making limited and considered modifications, plainly evidences a process which was devoid of any inequity for either party.

Much the same can be said of the alleged substantive unconscionability of the Agreement and extensions. The Court has explained that

---

[15] In fact, the Agreement states that it was "jointly drafted . . . with the benefit of advice from counsel" and that "none of the Parties will claim that any ambiguity in this Agreement shall be construed against any of the other Parties."

[16] As indicated *supra*, these provisions from the original Agreement were expressly reserved as remaining in "full force and effect" in the subsequent extensions.

> [s]ubstantive unconscionability involves unfairness in the contract itself and whether a contract term is one-sided and will have an overly harsh effect on the disadvantaged party. The factors to be weighed in assessing substantive unconscionability vary with the content of the agreement. Generally, courts should consider the commercial reasonableness of the contract terms, the purpose and effect of the terms, the allocation of the risks between the parties, and public policy concerns.

*Brown,* Syl. Pt. 19.   There is no question that the gross settlement amount swelled substantially as additional time was requested by Triple 7 to consummate the monetary settlement.  It is also self-evident that Triple 7 voluntarily engaged in re-negotiating the Agreement and extensions to avoid triggering the default reformation provision, a provision to which it had freely and willingly agreed in the first instance.  High Country had no advantage over Triple 7 at the time this provision was originally negotiated, nor at any time during negotiation of the extensions.

The corner into which Triple 7 painted itself was entirely of its own making. It voluntarily agreed to what it now claims is an unconscionable contingency in the event it failed to obtain funding for the settlement—funding it apparently never fully had in hand at the time it agreed to the default reformation provision.  Its interest in agreeing to the Agreement and extensions was to maintain its status as sole owner of a potentially very profitable mineral interest, yet it gambled with this status by willingly and *repeatedly*, conditioning its ownership on its ability to pay settlement funds which it clearly did not have.  We therefore conclude that the circuit court committed no error in finding that the Agreement and extensions were neither procedurally nor substantively unconscionable.

33

Finally, Triple 7 claims it was deprived of due process by the circuit court's dismissal of the case, including its counterclaim, in the order on appeal. Triple 7 insinuates that the dismissal of its counterclaim was a sua sponte error since High Country did not request dismissal of the case or counterclaim; instead, it sought appointment of a commissioner. More specifically, Triple 7 claims that the Agreement provided for dismissal only upon payment of the settlement proceeds; since it did not pay, it claims High Country was not entitled to dismissal. However, as we observed at the outset, the circuit court's order served in effect to enforce the settlement, irrespective of how the motion was styled. Upon enforcement of the terms of the Agreement, there was nothing left pending per the language of the Agreement.

The Agreement specifically provides that its intention is for the "[p]arties to this Agreement . . . to fully and finally resolve any and all current or future Claims (as defined in paragraph 1.1 herein below)[.]" Paragraph 1.1 defines "Claims" as including "counterclaims." The third extension, which governed the parties' Agreement for purposes of enforcement, also expressly states that it is for the purpose of resolving "the Parties' claims and counterclaims as filed in the Circuit Court of Mercer County, West Virginia[.]" Finally, the Agreement expressly directed High Country to file a dismissal of the case with prejudice upon payment of the settlement proceeds, under the assumption that is how the case would resolve—as opposed to the triggering of the default reformation provision.

34

Regardless, by appointing a commissioner to execute the reformation deed, the circuit court effectively enforced the settlement as agreed, the purpose of which was to bring the litigation to an end. Accordingly, we find the circuit court committed no error in dismissing the case in its entirety.

## IV. CONCLUSION

For the reasons set forth above, we affirm the October 2, 2019 order of the Circuit Court of Mercer County, West Virginia.

Affirmed.